James P. OSTROWSKI,
Plaintiff–Appellant,

v.

ATLANTIC MUTUAL INSURANCE COMPANIES, Defendant–Appellee.

No. 678, Docket 91–7674.

United States Court of Appeals,
Second Circuit.

Argued Dec. 16, 1991.

Decided June 19, 1992.

Debra L. Raskin, New York City (Stuart L. Lichten, Michael B. Ranis, Vladeck, Waldman, Elias & Engelhard, P.C., on the brief), for plaintiff-appellant.

Richard H. Block, New York City (Lisa Rosenthal, Elizabeth A. Barasch, Steven J. Feinstein, Stroock & Stroock & Lavan, on the brief), for defendant-appellee.

Before MESKILL, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff James P. Ostrowski appeals from so much of a final judgment entered in the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge*, as dismissed, following a jury verdict in favor of defendant Atlantic Mutual Insurance Companies ("Atlantic" or "Atlantic Mutual"), his claim under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (1988) ("ADEA"). On appeal, Ostrowski raises several challenges to the district court's instructions to the jury, including his contention that the court erroneously failed to give a burden-shifting charge in accordance with *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). We agree that the district court should have given such a charge, and we accordingly vacate the judgment and remand for a new trial.

## I. BACKGROUND

In January 1981, Atlantic hired Ostrowski as claims manager at its New York City office ("NYC office"). In 1983, Ostrowski was also made an officer of the company, with the title Secretary of Claims. As both claims manager and Secretary of Claims, Ostrowski had responsibility for, *inter alia*, supervising the investigation, processing, and payment of insurance claims at the NYC office. In his capacity as manager, Ostrowski reported to Atlantic's Secretary of Field Administration with respect to administrative matters concerning the NYC office. In his capacity as an officer, Ostrowski reported to Richard M. Pennington, Atlantic's Senior Vice President of Claims. Pennington was responsible for evaluating Ostrowski's overall performance and conducting his salary reviews.

Ostrowski served as claims manager and Secretary of Claims until April 1989, when his employment with Atlantic was involuntarily terminated. In the present action, he sought to prove that though prior to 1987 he had consistently received favorable performance evaluations from Pennington, when Ostrowski began hiring and promoting middle-aged and older persons protected by the ADEA, *see* 29 U.S.C. §§ 621, 623, 631 (generally prohibiting employment discrimination against persons age 40 or older on the basis of age), Pennington became highly critical and eventually had him fired principally in retaliation for hiring and promoting such persons. Ostrowski also claimed that there had been retaliation against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988) ("Title VII"), because of his hiring and promotion of minorities and women; he has not pursued the Title VII claims on appeal.

### A. The Evidence at Trial

At trial, Ostrowski presented evidence that until 1987, reviews rated his performance as excellent. In late 1984, Pennington wrote, "Mr. Ostrowski is doing an excellent job overall in his current assignment." In late 1985, Pennington wrote, "Mr. Ostrowski has completed his objectives well and is becoming an effective manager of people.... [I]t has to be said that the New York claims operation has never been better, a major contribution to the overall Atlantic results." In late 1986, Pennington wrote that Ostrowski "has met expectations ... by once again demonstrating his exceptional organizational and leadership abilities."

Ostrowski's other supervisor from September 1986 to November 1988 was Thomas Silika, who was then Atlantic's Secre-

tary of Field Administration. Prior to 1983, Silika had worked for another insurance company at which Ostrowski had been his supervisor. Silika described Ostrowski as a demanding but fair and professional worker and an excellent administrator who strove for excellence and instilled in others the desire to excel. Based on his experience both in supervising Ostrowski at Atlantic and observing Ostrowski supervise others, including himself previously, Silika testified that "Ostrowski ha[d] always had, in [Silika's] opinion, a good relationship with his staff." (Trial Transcript ("Tr.") 314.)

In 1987, Ostrowski began to receive poor reviews from Pennington, and he offered evidence that they were in retaliation for his hiring and promotion of older Atlantic employees. In 1987, Ostrowski hired Dominic Tringali, an attorney in his 60's, as a senior claims adjuster. Ostrowski testified that Pennington, after meeting Tringali, criticized Ostrowski, stating "[T]hat's not the type of person that we want to hire.... [T]hat guy should have retired years ago." (Id. at 125.) Notwithstanding this criticism, in the summer of 1988 Ostrowski hired Lionel DaCosta, who also was in his 60's. Ostrowski testified that Pennington's immediate reaction after meeting DaCosta was that "DaCosta is not Atlantic type material" and that he "should have stayed retired." (Id. at 139–40.)

Silika, the other Atlantic officer to whom Ostrowski reported, testified that in the late summer of 1988, Pennington convened a lunch meeting attended by Pennington, Silika, and Klaus Dorfi, who was Atlantic's Executive Vice President of Insurance Operations and Pennington's immediate supervisor. At that meeting, Pennington told Silika and Dorfi that Pennington "wanted to fire Mr. Ostrowski because of the hiring of Lionel DaCosta and Dominic Tringali." (Id. at 303.) Silika testified that Pennington had pointed out that "Tringali ... was 60 years old," and had stated that DaCosta "was 60 years old and that he doesn't have any future for him and that there is no way he can contribute." (Id. at 304–05.) Pennington had noted that "there are no young, upcoming, promotable people in [the

NYC office] because of Mr. Ostrowski's hiring practices," to which Dorfi responded, "Yes." (Id. at 305.) Dorfi did not agree at that lunch, however, that Ostrowski should be fired.

In November 1988, on Pennington's recommendation, Atlantic placed Ostrowski on six month's probation. In late February 1989, while on probation, Ostrowski rated Erika Krotman, an Atlantic employee, as "superior." Ostrowski testified that Pennington criticized this evaluation, stating, "Erika is 64 years old.... I can't see how she can be superior." (Id. at 147–48.)

In early April 1989, before the end of the probationary period, on Pennington's recommendation, Ostrowski was fired. Ostrowski contended that Pennington's recommendations were motivated by his antipathy toward older employees and toward Ostrowski for hiring and promoting such employees; he argued that Pennington's recommendations were, within the company, determinative.

In defense, Atlantic presented memoranda and testimony in order to show that its decision to fire Ostrowski had been based on his performance other than his personnel decisions with respect to older employees. It argued that no adverse employment action had been taken against any of the older employees hired or promoted by Ostrowski, and it contended that Ostrowski's performance had deteriorated significantly in 1987. During the fall of that year, a Quality Control Review ("QCR"), a process that evaluated the quality of claims handling in a given office, had been performed at the NYC office. As to portions of the QCR for the NYC office that were somewhat critical of claims handling, Ostrowski made intemperate comments on a number of the review sheets, criticizing the review process itself. Pennington testified that Atlantic officers viewed Ostrowski's comments as unprofessional and as indicative of a lack of teamwork and an inability to accept criticism.

Atlantic also contended that during this period other problems with Ostrowski's management style emerged, including ex-

cessive use of independent adjusters and poor relationships with other employees. In Ostrowski's 1987 evaluation, Pennington wrote, "Mr. Ostrowski has performed at a level which is less than expected and has verged on unsatisfactory.... In the past, Mr. Ostrowski has been viewed as having potential for greater responsibility. That potential is now in doubt."

In the summer of 1988, Ostrowski was involved in a controversy with his superiors as to whether a certain claim (the "Feldman claim") should be paid. Ostrowski found a number of difficulties and resisted its prompt settlement. Pennington testified that he and others believed that Ostrowski had mishandled the claim and determined that it should be settled. Ostrowski was directed to issue a check to the claimant, but he refused, taking the position that settlement was unjustifiable. Dorfi testified that Atlantic's senior management considered Ostrowski's refusal to sign the check to be so serious an act of insubordination that he discussed with Pennington and Atlantic's president whether Ostrowski should be fired at that time.

When Atlantic placed Ostrowski on probation in November 1988, Pennington's memorandum to him stated that that action was being taken because of deficiencies in Ostrowski's management style, his mishandling of the Feldman claim, and his "initial response to the 1987 QCR." When, during the probationary period, Pennington determined that Ostrowski's performance had not improved, Ostrowski was fired. Dorfi and Shirley Grill, Atlantic's Vice President of Human Resources, testified that although Pennington had recommended both the probation and the firing, Dorfi and Grill, along with Atlantic's president and chairman, had conducted their own independent review of Ostrowski's performance apart from Pennington's recommendations and had made the final decisions. Dorfi, questioned at trial as to his role in evaluating Ostrowski's performance, stated that during the last one or two years of Ostrowski's employment he had not spoken to Ostrowski at all and indicated that his knowledge of Ostrowski's performance during the probationary period had come from Pennington's reports:

Q. After he was placed on probation, did his performance improve?

A. I had no direct contact with him during that period, and based on the information I received, it did not.

Q. Aside from what other people told you, did you attempt to establish independently whether his performance had improved?

A. Not really, no.

Q. While Mr. Ostrowski was on probation, did you discuss his performance with Mr. Pennington?

A. Yes, I did.

Q. How frequently?

A. I was very concerned about how things were going. I was hoping that things could resolve themselves, that he could stay on with the company, and every month or so I would ask how were things going, what's happening, that kind of thing.

Q. Aside from Mr. Pennington, did you discuss his performance on probation with anyone else?

A. I discussed him with human resources and the president. Typically the president—he was my boss and I would keep my boss informed of any procedure of that nature involving an officer of the company, and also we stayed in close contact with human resources on issues of this type.

Q. Did there come a time when it was decided to terminate Mr. Ostrowski's services?

A. Yes....

Q. Were you involved in the making of that decision?

A. Yes.

Q. What was your involvement?

A. Basically I discussed it with Mr. Pennington and human resources and the president, and I recommended to the president that we discharge Mr. Ostrowski.

Q. Why did you make that recommendation?

A. Based on all the feedback I had heard, I felt that there was no real con-

structive rehabilitation taking place, and this whole episode and constant arguments was a strain on Mr. Pennington, it was a strain on the organization, and I concluded it would be best for all parties if his employment terminated.

(Tr. 671–73.)

## B. *The Instructions to the Jury on Burden of Proof*

■ Prior to the submission of the case to the jury, Ostrowski requested that the jury be given a burden-shifting charge modeled after the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (*"Price Waterhouse"*). Plaintiff's Request No. 13 ("Request 13") stated in pertinent part as follows:

> A plaintiff who presents direct evidence of a defendant's retaliatory motivation is not required to prove other facts, such as the pretextual nature of the defendant's stated reason for plaintiff's termination.... If you find that such evidence demonstrates that retaliation was a determinative factor in Atlantic's decision to terminate Ostrowski's employment, you must find for plaintiff unless defendant can prove that defendant would have made the decision in any event without regard to plaintiff's protected activity.... *Price Waterhouse v. Hopkins*, 490 U.S. 228, [109 S.Ct. 1775, 104 L.Ed.2d 268] (1989)....

As discussed in greater detail in Part II.A. below, the district court did not give the jury a *Price Waterhouse* charge.

Instead, the court asked the jury to answer the following single interrogatory:

> Do you find that retaliation on the issue of age discrimination was a determinative factor in Atlantic Mutual terminating plaintiff?

(Tr. 1029.) As to the meaning of "determinative," the court stated that

> [i]n order for the age discrimination issue to be a determinative factor, it has to be a factor but for which the plaintiff would not have been fired. In order for it to be a determinative factor, you must find

really that if it had not been for this, he would not have been fired.

> On the other hand, if you are satisfied that he would have been terminated because of the factors listed in that series of memoranda ... and in the testimony of Atlantic Mutual, if you are satisfied that he would have been fired for those factors, and if no other factors had existed, then this issue we are talking about would not be a determinative factor.
>
> ....
>
> .... We are not saying that this age issue has to be the sole reason, but it has to be something that was essential to the decision, and if it wasn't essential, it either didn't exist or wasn't essential to the decision, then it does not result in liability for Atlantic Mutual.

(*Id.* at 1036–37.) As to the burden and quantum of proof, the court instructed the jury that Ostrowski was required to "prove his case before you by a fair preponderance of the evidence" (*id.* at 1026), and stated, *inter alia,* "[t]hat means that the plaintiff must tip the scale in his favor in order to win" (*id.* at 1027). The court told the jury that if the two pans on the scale were even, "our law is that the plaintiff loses." (*Id.* at 1028.) The jury was not informed that, if it viewed the evidence in a certain way, the burden would shift to Atlantic.

Immediately after the court charged the jury, Ostrowski objected to, *inter alia,* the court's failure to give a burden-shifting instruction, citing *Price Waterhouse* and this Court's opinion in *Grant v. Hazelett Strip–Casting, Corp.*, 880 F.2d 1564 (2d Cir.1989). As discussed in greater detail in Part II.A. below, the district court responded that a burden-shifting charge was not justified because Ostrowski's evidence of retaliatory motive was circumstantial and weak. The court stated, however, that it would take another look at the cases. In the meantime, it directed the jury to begin deliberations.

While the jury was deliberating, the court reviewed *Price Waterhouse* and stated that it was "not sure that there shouldn't be an instruction," that "there is a legitimate question," and that "[i]f some-

one wants to present me with a proper instruction ... I'll consider it." (Tr. at 1063–64.) On the following morning, Ostrowski objected to being placed in the "very awkward position of trying to go out and correct [the instructions that the jury] ha[d] been given," and he did not offer a new proposed charge. (*Id.* at 1075.) The court informed the parties that it believed the instructions as given were correct and that it would not modify them.

On the third day of deliberations, the jury responded "No" to the question whether "retaliation on the issue of age discrimination was a determinative factor" in Atlantic's termination of Ostrowski. Judgment was entered in favor of Atlantic dismissing all of Ostrowski's claims, and this appeal of the dismissal of the ADEA claim followed.

## II. DISCUSSION

On appeal, Ostrowski contends, *inter alia,* that the district court erred in failing to provide the jury with a burden-shifting instruction pursuant to *Price Waterhouse.* Atlantic contends that this argument has been waived. We reject the waiver contention and conclude that Ostrowski is entitled to a new trial with the jury properly instructed on the burden of proof.

### A. *The Alleged Waiver*

Atlantic contends that Ostrowski waived his right to pursue the burden-shifting argument on appeal by failing to call *Price Waterhouse* to the court's attention prior to its instructions to the jury and by failing to pursue its burden-shifting objection thereafter. We disagree.

The Federal Rules of Civil Procedure provide that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The purpose of the Rule is to require the parties to give the trial court an adequate opportunity to cure any error in the instructions before the jury deliberates. *See, e.g.,* 9 C. Wright & A.

Miller, *Federal Practice and Procedure* § 2551, at 623 (1971). Absent objection, an error may be pursued on appeal only if it is plain error that may result in a miscarriage of justice, or in "obvious instances of ... misapplied law." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981); *see, e.g., Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985). In the present case, the record indicates both that Ostrowski adequately brought his *Price Waterhouse* contention to the trial court's attention and that the jury instructions contained plain error of law.

Preliminarily, we note that if there were no plain error and if Ostrowski had done nothing more than proffer his Request 13, we might be inclined to agree that he had insufficiently preserved his present challenge to the court's failure to give a *Price Waterhouse* burden-shifting charge, for, as indicated in Part II.C.1. below, the use of the term "determinative" factor did not appropriately reflect the ruling of *Price Waterhouse. See, e.g., United States v. Ouimette,* 798 F.2d 47, 49 (2d Cir.1986), *cert. denied,* 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988) (failure to give a requested charge is not error unless the requested charge "accurately represented the law in every respect"). However, the present record reveals that Ostrowski's effort was not so limited and that the court's refusal to give a burden-shifting charge was not attributable to lack of notice or opportunity to cure.

First, when counsel and the court retired to the robing room immediately after the court initially charged the jury and before the jury was allowed to begin its deliberations, Ostrowski's attorney promptly stated her objections, including the objection that the court had failed to give the *Price Waterhouse* charge:

THE COURT: What is the Price Waterhouse charge?

Ms. RASKIN [Ostrowski's attorney]: What it says, your Honor, is that if there is direct evidence of discriminatory intent, and we would say that the comment of Mr. Pennington that he wanted to fire

Ostrowski because of the hirings of Da-Costa and Trangali [*sic*], if there is such direct evidence and the jury believes it, that then shifts the burden to defendant to prove that Mr. Ostrowski would have been fired in any event. It is a burden-shifting kind of charge....

(Tr. 1052.) The reference to "direct" evidence is from *Grant v. Hazelett Strip-Casting, Corp.*, 880 F.2d 1564 ("*Grant*"), and though as we discuss in Part II.B. below, *Grant*'s use of that term was ambiguous, counsel's description adequately reflected our language and sufficiently alerted the court to the ruling in *Price Waterhouse*. Hence, Ostrowski adequately gave the court an opportunity, before the jury began deliberations, to give a *Price Waterhouse* charge.

Second, the record indicates that the court refused to give a *Price Waterhouse* charge because it believed the trial evidence did not warrant such a charge. After hearing Ms. Raskin's description and noting that *Grant* referred to a plaintiff's presentation of "direct evidence" of a defendant's illegitimate motivation, 880 F.2d at 1568, the court stated that Ostrowski had failed to present any such direct evidence:

> That is exactly what you have not proved.... Nothing in the way of direct evidence, all inferences.... It is all circumstantial evidence, if not speculation.... There is no direct evidence of a retaliatory motive. All you are doing is to cite that certain circumstances have grown up and you urge the jury that this shows that the real reason is not what the direct evidence says but what the circumstances showed.... [I]t would be to me a travesty of justice to say that that puts on the defendants the burden of proof as to retaliation.

(Tr. 1053–54.)

Further, after submitting the case to the jury and continuing its review of the case law, the court also stated its view that a *Price Waterhouse* charge was not warranted merely by the presentation of direct evidence of discriminatory motive:

The Supreme Court in Price Waterhouse, and the Second Circuit in Grant certainly talk about a circumstance which places a burden upon a defendant, but that circumstance is not constituted of the plaintiff presenting direct evidence. And I don't know how anybody could get that from the cases.

Presenting evidence, we all know what it means. You could have the most incredible witness imaginable get on the stand and testify:

"I heard Mr. Pennington say that he was firing Mr. Ostrowski because he wanted to get rid of this person who was hiring old people."

That is the presentation of direct evidence. And under your formulation you could have somebody get up, who was impeached from A to Z, and still you would not have to present any—you don't have to prove other facts. I don't know what that means.

The Supreme Court held, very clear and what the Second Circuit held, and I'm reading 490 U.S. at page 244[,109 S.Ct. at page 1787]:

"Once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role."

That's the holding of the court. That is not saying once a plaintiff produces some direct evidence. It says once a plaintiff shows.

(Tr. 1059–60.)

In addition, the trial judge expressed his reluctance to attempt a *Price Waterhouse* charge (a) because *Price Waterhouse* spoke in terms of a "substantial" "motivating" factor, whereas he had used the concept "determinative" factor, and attempting to differentiate between those two concepts could confuse the jury, and (b) because the court apparently believed that the concept of retaliation was incompatible with that of "mixed motives":

I have a problem. I try very hard in instructing a jury not to introduce a lot

of different concepts. I have instructed them on the burden of proof to show that this age issue was a determinative factor....

....

In this case, from the practical standpoint I don't think there is any real distinction, any viable distinction between determinative factor on the one hand or motivating or substantial factor on the other. Let's just consider Pennington's state of mind. It seems to me in this case, he either had this as a factor in the dismissal or he didn't.

....

.... Retaliation is something you really have to think up. Almost by definition, retaliation is like being a little bit pregnant. I don't know how you have a little bit of retaliation or a substantial amount of retaliation versus a determinative amount of retaliation. It is just its own thing.

(Tr. 1067, 1069, 1070.)

In all of these circumstances, we are not inclined to view Ostrowski's stance on the second day of deliberations as a waiver. At that time, Ostrowski did not further pursue his request for a burden-shifting charge, objecting instead to the process by which he had been placed in the position of seeking that charge in the middle of deliberations. At that session, the court stated that though it "believe[d] an argument could have been made, and if anybody wished to have the charge amended now I think an argument could be made for an instruction along the line of the Grant case" (*id.* at 1078), its preference was not to amend the instructions because it believed, in light of the weight of the evidence, they were correct as given:

It seems to me that in this case, which is a case of alleged retaliation, where the direct evidence of retaliation, if there is any, is far, far weaker and more debatable than what was involved in Price Waterhouse or Grant, and for various other reasons, it seems to me that as long as Hagelthorn [*Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983)] is good law, I think that the jury was given

a proper instruction and I would not—if the matter is up to me I would like to voice the view that I would not be in favor of amending the instruction and I think the approach was proper.

(Tr. 1078–79.)

In sum, prior to allowing the jury to begin deliberating, the district court rejected the request for a *Price Waterhouse* charge not because it was not alerted to the nature of the request but because it believed such a charge was not warranted. After submitting the case to the jury, the court, though stating its willingness to consider further, adhered to its view, for the various reasons quoted above, that a *Price Waterhouse* charge was not appropriate and that the instructions were correct as given. In the circumstances, there was no waiver.

We should add that it is the better practice for the trial court to take the necessary time to determine the appropriate instructions—especially on a matter so fundamental as the burden of proof—before directing the jury to begin deliberations, for it may well be difficult for the court to bring home to the jury such fundamental corrections after deliberations are well underway. Here, even that ordinary difficulty was exacerbated because the court had intimated in its closing remarks to the jury that the case was perhaps a relatively simple one that might be decided in as little as an hour. (*See* Tr. 1049 (initially stating, "You will probably be starting your deliberations at 3:30. I never ask jurors to work late but you might want to work until about 5 tonight. I don't particularly see why you should not finish tonight.... What I am going to ask you to do is to start work tonight. Maybe you can finish."); and *id.* at 1057 (in having the jury begin deliberations at 3:45, stating, "I am very willing to adjourn at 4:45. Let's leave it, if you finish, you finish by 4:45.")) Given the flavor of the court's comments as to timing, we have a certain sympathy with Ostrowski's view that by the second day of deliberations, corrective instructions were unlikely to be sufficient to cure the error in the court's initial burden-of-proof charge.

B. *The Proper Charge as to Burden of Proof*

The ADEA prohibits discrimination with respect to the employment of workers age 40 or older on the basis of age, 29 U.S.C. §§ 621, 623, 631, and makes it unlawful for an employer to retaliate against an individual for opposing such age discrimination, *id.* § 623(d). In *Price Waterhouse*, 490 U.S. 228, 109 S.Ct. 1775, the Supreme Court discussed the respective burdens of proof of parties to suits brought under Title VII. Since "the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII,'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (quoting *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)), we have held that the *Price Waterhouse* framework applies to actions brought under the ADEA, *see, e.g., Grant*, 880 F.2d at 1568; *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

In *Price Waterhouse*, the Court dealt with a mixed-motivation case, in which the plaintiff offered evidence, credited by the district court as factfinder, that a forbidden reason played a motivating role in the adverse employment decision. The plaintiff, the only woman among 88 candidates for partnership in the defendant accounting firm, was one of 20 the partnership decided to put on "hold," and she presented evidence specifically showing gender animus on the part of partners in the firm. For example, documents indicated that "[o]ne partner described her as 'macho' (Defendant's Exh. 30); another suggested that she 'overcompensated for being a woman' (Defendant's Exh. 31); a third advised her to take 'a course at charm school' (Defendant's Exh. 27)." *Price Waterhouse*, 490 U.S. at 235, 109 S.Ct. at 1782 (plurality opinion). The partner who explained to the plaintiff why her candidacy was being placed on hold told her she needed to " 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.' " *Id.* (quoting district court's findings). The defendant presented evidence, also credited by the district court, that the firm also had legitimate concerns about the plaintiff's interpersonal skills.

In allocating the burdens of proof in light of this evidence, the *Price Waterhouse* Court used the analysis adopted in, *inter alia, Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy*, which involved a claim that the plaintiff had been fired for exercising his free-speech rights under the First Amendment, the Court held that once the plaintiff had shown that his constitutionally protected speech was a " 'substantial' " or " 'motivating factor' " in the adverse treatment of him by his employer, the employer was obligated to prove " 'by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff] even in the absence of the protected conduct.' " *Price Waterhouse*, 490 U.S. at 249, 109 S.Ct. at 1790 (plurality opinion, quoting *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576); *see Price Waterhouse*, 490 U.S. at 258–60, 109 S.Ct. at 1794–96 (White, J., concurring, approving use of *Mt. Healthy*). The *Price Waterhouse* Court held similarly that if the plaintiff in a Title VII suit can establish that a prohibited discriminatory factor played a "motivating part" in the challenged employment decision, the defendant, in order to avoid liability, has the burden of proving "by a preponderance of the evidence that it would have made the same decision" even if it had not taken the discriminatory factor into account. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795 (plurality opinion); *see id.* at 259–60, 109 S.Ct. at 1795–96 (White, J., concurring); *id.* at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring).

The *Price Waterhouse* Court made clear that the burden-shifting threshold a plaintiff must cross is proof that the forbidden animus was at least one of the "motivating" factors in the employment decision; he or she need not show that it was the sole reason, or the "true" reason, or the "principal" reason. *See, e.g.*, 490 U.S. at 247, 109 S.Ct. at 1788–89 (plurality opinion)

(in mixed-motives case it "makes no sense to ask whether the legitimate reason was '*the* "true reason"'" for the decision (emphasis in original)); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring) (plaintiff "not required to prove that the illegitimate factor was the only, principal, or true reason for petitioner's action").

 The *Price Waterhouse* principle often leads to the paradoxical situation, as it did in the present case, of a plaintiff asking for a mixed-motive instruction. The *Price Waterhouse* issue does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors. Once the presentation of evidence is sufficient to create this possibility, the employer has the option of defending on the *Price Waterhouse* ground that it would have made the same decision even in the absence of a discriminatory motive. *Price Waterhouse* is thus a defense. However, for tactical reasons, it is often only the plaintiff who asks for a *Price Waterhouse* instruction, for when requests to charge are submitted, the employer may well choose to avoid the burden-shifting language in the *Price Waterhouse* charge, hoping that the jury either will not find a forbidden animus or will believe the burden is on the plaintiff in the case of a mixed motive. We thus believe that the plaintiff will be entitled to a burden-shifting instruction on the *Price Waterhouse* defense where the evidence is sufficient to allow a trier to find both forbidden and permissible motives. In such circumstances, the failure to give such an instruction would create a risk that the jury, having agreed with the plaintiff's evidence that a forbidden animus played a motivating part in the employment decision but not with the plaintiff's contention that the employer's proffered explanations were pretextual, would mistakenly believe that the plaintiff had the burden of showing that the same employment decision would not have occurred in the absence of the forbidden motive.

When a plaintiff requests and is entitled to a *Price Waterhouse* instruction, however, the jury must be told that the mixed-motive issue does not arise unless it first determines that the plaintiff has carried the burden of proving a forbidden motive but has failed to prove that the employer's explanations were pretextual.

The question raised by the district court in the present case is what kind of evidence is sufficient to warrant an instruction that there may be such a shift. Not all evidence that is probative of discrimination will entitle the plaintiff to a *Price Waterhouse* charge. In *Grant,* in which the president of the defendant company had stated that he wanted a younger person in the plaintiff's position, we stated that the burden was shifted by the plaintiff's proof of age as a motivating role "by direct evidence." 880 F.2d at 1568. In a more recent decision, *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176 (2d Cir.1992), filed subsequent to the trial in the present case, we clarified that *Grant* did not use the term "direct" in its sense as antonym of "circumstantial," for that type of "direct" evidence as to a mental state is usually impossible to obtain:

> "Direct evidence", it seems, is an unfortunate choice of terminology for the sort of proof needed to establish a "mixed-motives" case. "Direct" and "indirect" describe not the quality of the evidence presented, but the manner in which the plaintiff proves his case. Strictly speaking, the only "direct evidence" that a decision was made "because of" an impermissible factor would be an admission by the decisionmaker such as "I fired him because he was too old." Even a highly-probative statement like "You're fired, old man" still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences.

*Tyler v. Bethlehem Steel Corp.,* 958 F.2d at 1185. Thus, in *Tyler* we made clear that a plaintiff may prove that the forbidden animus "was a motivating factor" through

the presentation of either " 'direct' or 'circumstantial' evidence." *Id.* at 1186.

■ We would emphasize here that though sufficient proof that the forbidden factor played a "motivating role" to entitle the plaintiff to a burden-shifting instruction may be furnished through circumstantial evidence, that circumstantial evidence must be tied directly to the alleged discriminatory animus. For example, purely statistical evidence would not warrant such a charge; nor would evidence merely of the plaintiff's qualification for and the availability of a given position; nor would "stray" remarks in the workplace by persons who are not involved in the pertinent decisionmaking process. Those categories of evidence, though they may suffice to present a prima facie case under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion, *see generally Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12 (plurality opinion), would not suffice, even if credited, to warrant a *Price Waterhouse* charge. If, however, the plaintiff's nonstatistical evidence is directly tied to the forbidden animus, for example policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden-shifting instruction.

In *Tyler,* the plaintiff had presented evidence not only that younger employees had received favorable treatment while he had not, but also that the company had an approved category of employees it called the " 'Young Tiger' classification," and that company appraisals specifically referred to " 'youth' in a positive manner." 958 F.2d at 1179. Consequently, there was sufficient evidence directly reflecting an animus against older workers to warrant a burden-shifting charge, and we approved the district court's instructions on that record that the jury should consider whether Tyler had established, *inter alia,*

> that the termination ... *occurred under circumstances giving rise to an inference* that age was a motivating factor in the decision.... [P]laintiff is not required to prove that age was the sole or exclusive motivation for defendant's termination decision. If you find that age was one of the reasons that prompted the defendant to take that action, then you will consider the defendant's defenses as to which the defendant bears the burden of proof by a preponderance of the evidence,

*id.* at 1186 (emphasis added), and that

> [i]f you find that plaintiff has failed to prove that his age was a motivating factor in the defendant's decision, then you must find for the defendant. If, however, the plaintiff has established each of the elements of this claim, then you will turn to defendant's defenses as to which the defendant bears the burden by a preponderance of the evidence; that is, if you find that the plaintiff has proven by a preponderance of the evidence that his age was a motivating factor in the defendant's decision to terminate[ ] him ... he is entitled to recover, unless the defendant establishes by a preponderance of the evidence that it would have taken the same action regardless of plaintiff's age,

*id.* at 1179–80.

■ In sum, if the plaintiff presents evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence is sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision, the jury should be instructed that if it does draw that inference the plaintiff is entitled to recover unless the employer has established by a preponderance of the evidence that the employer would have taken the same action without consideration of the impermissible factor. The jury should also be instructed, in substance, that the "employer may not meet

its burden in [a mixed-motives] case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason.... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1791–92 (plurality opinion); *see id.* at 261, 109 S.Ct. at 1796 (White, J., concurring); *id.* at 276–77, 109 S.Ct. at 1804 (O'Connor, J., concurring).

■ In the present case, the jury was given no indication that Atlantic, under any circumstances, could have any burden of proof. Rather, the court stated uniformly that the burden was on Ostrowski, and it stated, *inter alia,* that

... I would instruct you as a matter of law that the executives at Atlantic Mutual had a right under the federal laws to terminate Mr. Ostrowski about what they viewed as misconduct in the Feldman claim, if that is the way they viewed it. They had a right to terminate him for insubordination for refusing to sign the check and they could have done it at that moment, and it wouldn't have been a violation of the age discrimination statute.

(Tr. 1032.) The evidence presented by Ostrowski, however, was ample to require the court to give the jury the *Price Waterhouse* burden-shifting instruction. Ostrowski testified that when Pennington, an Atlantic Senior Vice President, met two ADEA-protected employees hired by Ostrowski, Pennington stated that Ostrowski should not have hired them because they should have been, or should have remained, retired. There was also testimony from Ostrowski and Silika, respectively, that Pennington stated the views that an employee who is 64 years old "can't ... be superior," and that as to an employee "60 years old ... there is no way he can contribute." Silika further testified that Pennington stated expressly to him and to Dorfi, Atlantic's Executive Vice President, that Pennington wanted to fire Ostrowski because of his hiring of older employees. Silika testified that when Pennington stated

that Ostrowski was disserving the company by hiring older employees, Dorfi, who Atlantic admits was one of its decisionmakers, agreed.

Pennington's statements were explicit evidence of his age-based animus and his desire to fire Ostrowski for a forbidden reason. Silika's testimony was also evidence (a) that Pennington explicitly told one of Atlantic's decisionmakers, Dorfi, of his desire to fire Ostrowski because of the forbidden reason, and (b) that Dorfi had expressed his agreement with Pennington's criticism of Ostrowski's hiring of older rather than younger workers.

There was also ample circumstantial evidence in the sequence of events to support the contention that Pennington's demonstrated age-based animus was a substantial motivation in his recommendation for Ostrowski's probation and firing. The sequence presented in Ostrowski's evidence included (a) Ostrowski's excellent pre–1987 reviews, (b) his 1987 hiring of an employee in his 60's, (c) Pennington's prompt criticism of Ostrowski on the ground that the employee was too old, (d) Ostrowski's receipt from Pennington later in 1987 of an unfavorable performance review, (e) Ostrowski's summer of 1988 hiring of another employee in his 60's, (f) Pennington's criticism of Ostrowski because that employee likewise was too old, (g) Pennington's statement late in the summer of 1988 that he wanted to fire Ostrowski because of his hiring of those older employees, (h) Atlantic's placement of Ostrowski on probation some two months later as recommended by Pennington, (i) Ostrowski's evaluation, some four months into his probationary period, of a 64–year–old employee as "superior," (j) Pennington's response that a 64–year–old cannot be superior, and (k) the company's firing of Ostrowski a few weeks later, as recommended by Pennington, before the end of his probationary period. Though Atlantic, as described in Part I.A. above, presented countervailing evidence, Ostrowski's evidence, if believed, as to the above sequence of events, together with Dorfi's endorsement of Pennington's criticism of Ostrowski's hiring of older workers, and Dorfi's lack of first-hand knowl-

edge as to Ostrowski's performance during the truncated probationary period (in which Pennington continued to criticize Ostrowski's continued praise of the work of older employees), provided ample evidence from which a rational juror could infer that ADEA-prohibited age animus was a substantial "motivating" factor in the company's treatment and firing of Ostrowski.

Thus, the jury should have been instructed that if it did draw that inference, it should return a verdict in favor of Ostrowski unless it was persuaded that Atlantic had proven by a preponderance of the evidence that the company would have fired Ostrowski without regard to its opposition to his hiring and promotion of older employees. The court could not refuse to give the burden-shifting instruction because the court itself viewed Ostrowski's witnesses as not credible or his evidence as weak. *See* Part II.C.2. below. The assessment of credibility, the weighing of the evidence, and the determination as to what inferences to draw lay solely within the province of the jury.

Since the jury was given no indication that Atlantic, on any view of the evidence, could have any burden of proof, Ostrowski is entitled to a new trial with the jury properly instructed.

## C. *Other Problems*

Ostrowski also makes challenges to other aspects of the trial court's instructions to the jury, certain of which are not without foundation. We are concerned principally with (a) the treatment of the present case as a "pretext" case rather than a "mixed-motives" case, (b) a blurring of the roles of the court and the jury, and (c) a flaw in the instruction as to the meaning of the term "preponderance" of the evidence.

### 1. "Pretext" Cases vs. "Mixed-motives" Cases

In the course of its instructions, though the court told the jury that a decision could have more than one reason, it also repeatedly stated that the key issue in this case was whether Atlantic's proffered explanations for firing Ostrowski were "gen-

uine" and the "real" reasons for that action:

> [T]he issue before you is *whether those were the real reasons* for his discharge or whether there was some ulterior reason, namely, retaliation on the age discrimination issue.... The *only* issue before you is, *were these the real reasons*, the reasons that were in the memos written and the letters written by Mr. Pennington, the documents.... *It is ... a question of whether they were genuine* or were concealing an ulterior motive, namely, retaliation because of these discrimination problems.
>
> .... [I]t is not a matter of whether you or I agree with the judgment, it is a question of *whether this was genuine or whether it was concealing some ulterior motive,* namely, retaliation on a discrimination problem.

(Tr. 1032–33 (emphasis added).) The court went on to say that

> if these factors about the Feldman file and the various other things—I won't keep repeating it—*if you believe that they existed and they would have caused him to be fired,* they were sufficient for him being fired in the minds of the executives of Atlantic Mutual, *then obviously they are the determinative factors* and Atlantic Mutual would not be liable for some allegation about an age discrimination problem.

(*Id.* at 1037 (emphasis added).) And in tying these instructions to the jury interrogatory question as to whether the issue of age discrimination was a "determinative" factor in the firing, the court stated,

> I think you must recognize that if you find a yes answer to question 1, you are accepting the proposition that Mr. Pennington engaged not only in the desire to retaliate, in the retaliatory action, but that he carefully *contrived* a lengthy list of factors relating to Mr. Ostrowski's performance and *deliberately concealed his primary, or at least an important motive, thus deceiving his superiors.* That would be the meaning of a yes answer to question 1. It is a most serious charge, and the plaintiff must prove

that by a fair preponderance of the evidence to prevail.

(*Id.* at 1047 (emphasis added).) Notwithstanding the court's earlier instruction, the above statements suggested to the jury that as a matter of law there could only be legitimate reasons or illegitimate reasons, not both.

 These formulations, together with the emphasis on the term "determinative" factor, and the trial court's view expressed in the robing room that there can be no such thing as "a little bit of retaliation or a substantial amount of retaliation" (*id.* at 1070), indicate that the court treated the present matter as simply a pretext case. As *Price Waterhouse* pointed out, a pretext case is one in which there was either unlawful motivation or lawful motivation, but not both; a mixed-motives case is one in which there were both lawful and unlawful motivations. 490 U.S. at 247, 109 S.Ct. at 1788–89 (plurality opinion). We reject the district court's view that a claim of retaliation necessarily presents only a pretext case and cannot be a mixed-motives case. There is no reason in fact or in theory why an employer in firing an employee cannot be motivated in part by legitimate factors and in part by its intolerance of the employee's refusal to stop hiring and promoting older workers. Since in a mixed-motives case "it simply makes no sense to ask whether the legitimate reason was '*the* "true reason," ' " *id.* (emphasis in original), the plaintiff is not required to show that a single factor was or was not "determinative," and is not required to show that the explanations advanced by the employer were "contrived." Though we appreciate that the court may have been prompted to view the case as a pretext case by Ostrowski's attacks on Atlantic's proffered explanations, the evidence was such that the jury could find that both lawful and unlawful motives existed. Thus, the court's telling the jury here that it should determine whether Atlantic's explanations were "real" or "genuine" as opposed to "contrived," without also indicating that if it found the explanations advanced were genuine the burden might nonetheless shift to the defendant, obscured the proper analysis.

As discussed in Part II.B. above, we do not mean to say that a mixed-motive finding is possible in every discrimination case. For example, an accountant plaintiff may establish a prima facie case that age discrimination was a motivating factor and the defendant may establish a prima facie case that the plaintiff had embezzled substantial funds. The trier would have to believe one or the other, and a finding of mixed motive simply would not be possible. In such circumstances, a *Price Waterhouse* charge should not be given. In the present case, however, a jury might easily conclude that permissible and forbidden motives co-existed.

We also note in passing that, though a trial court is permitted to marshal the evidence for the jury and, if it chooses, to comment on it, the court is not permitted to impose its own opinions on the jury or to present its own theories when they are not strongly grounded in the evidence. *See, e.g., Ah Lou Koa v. American Export Isbrandtsen Lines, Inc.*, 513 F.2d 261, 263 (2d Cir.1975). Though the trial judge here was generally careful to remind the jury that the jury was the finder of fact, the portions of the charge quoted above appear to have suggested to the jury that in fact if Pennington had any age-based desire for retaliation, his superiors would not have been aware of it. And in a similar vein, the court told the jury:

> [t]here is no evidence whatever that Mr. Dorfi had any motivation to retaliate against Mr. Ostrowski for any reason whatever relating to discrimination. Nobody contends that.

(Tr. 1044.) The court's suggestion that the Atlantic decisionmakers would not have been aware of Pennington's opposition to the hiring and promotion of ADEA-protected workers ignored the evidence that Pennington had told Dorfi explicitly that Pennington wanted to fire Ostrowski because of Ostrowski's hiring of older workers. And the statement that there was "no evidence whatever" that Dorfi had an age-based motive "relating to discrimination"

seemed to foreclose inferences that the jury was permitted to draw. To the extent that the court meant that there was no evidence that Dorfi had any age-based animus, the court gave a mistaken view of the record, for Silika testified that when Pennington expressed criticism of Ostrowski for hiring older workers rather than younger workers, Dorfi agreed. Thus, there was evidence from which a rational juror could infer that Dorfi shared Pennington's view that Ostrowski should not be hiring ADEA-protected persons. To the extent that the court may have meant instead that there was no evidence that Dorfi's agreement with this view actually played a role in his decision, the court appears to have interposed its own opinion as to what inference should be drawn from the circumstantial evidence.

### 2. The Burden To "Show": Jury Trial vs. Bench Trial

■ In rejecting Ostrowski's request for a *Price Waterhouse* charge, the court indicated its view that even if a plaintiff presented evidence that the decisionmaker had been heard to admit that he fired the plaintiff for an impermissible reason, that would not suffice to warrant a burden-shifting instruction. The court stated, *inter alia,* that impeachment of the witness so testifying could impair his or her credibility (Tr. 1059–60), that the evidence in the present case was "far, far weaker and more debatable" than that adduced by the plaintiff in *Price Waterhouse* (Tr. 1078), and that "the [*Price Waterhouse*] court.... is not saying once a plaintiff *produces* some direct evidence. It says once a plaintiff *shows* " (Tr. 1060 (emphasis added)). Thus, the district court appears to have taken the position that if the court itself viewed the plaintiff's witnesses as not credible or his evidence as weak, there should be no burden-shifting instruction because the plaintiff had not "show[n]" the discriminatory animus.

We disagree, and we think the confusion originates in the fact that *Price Waterhouse* was a Title VII case. Though the substantive principles governing Title VII cases are generally applicable to ADEA cases, there are important procedural differences. Heretofore, Title VII cases have not been tried to a jury, *see, e.g., Lehman v. Nakshian,* 453 U.S. 156, 164, 101 S.Ct. 2698, 2703, 69 L.Ed.2d 548 (1981); *but see* Civil Rights Act of 1991, Pub.L. 102–166, (granting right of jury trial in Title VII cases), and hence have not involved jury instructions; in such cases, the court is the factfinder, and it already knows the law. In contrast, ADEA cases are tried to a jury, which both (a) minimizes the role of the court as to the weighing of evidence, the drawing of inferences, and the assessment of witness credibility, and (b) creates the need for instructions as to how the jury should proceed if it views the plaintiff's evidence in a certain way. In the *Price Waterhouse* discussion of the burden of proof in a nonjury Title VII case, the statement that the burden is to shift once the plaintiff "shows" the requisite threshold fact is sufficiently complete in the context of a bench trial; since the trial court knows there is to be no shifting of the burden unless the court, as factfinder, is persuaded that the inference urged by the plaintiff is to be drawn, the court in its decision need not mention any shift in the burden unless and until it is so persuaded. In a jury trial, however, the *Price Waterhouse* formulation must be tailored to fit the different procedural structure. The jury must be instructed on the law, including the possibility of burden-shifting, before it begins its factfinding. Hence, if sufficient evidence is presented at trial to permit an inference that the forbidden motivation has been "show[n]," the matter is to be submitted to the jury with the instruction that, if the jury is persuaded that the plaintiff has so "show[n]," the burden shifts. The *Price Waterhouse* formulation does not mean that the court, as lawgiver but not factfinder, is itself to decide whether or not the requisite fact has been "show[n]."

### 3. The Meaning of "Preponderance"

■ Finally, since there is to be a new trial we note our concern with a portion of the court's charge, not mentioned by Ostrowski on this appeal, dealing with what is

meant by a "preponderance" of the evidence. The court stated, in part that

> when you are back weighing the evidence and you are discussing the evidence in your deliberations, and you have this issue which has been presented to you, you have to be able to say, I believe that the plaintiff has the stronger case. There is enough *convincing* quality in the plaintiff's case to *convince* me that the evidence is in his favor. The doubts, the questions have to be resolved at least that much for you to say *confidently* things are in his favor, I see it his way.

(Tr. 1027–28 (emphasis added).) Though the court's explanation of "preponderance" was otherwise entirely appropriate, the emphasized language may have been susceptible to an unduly stringent interpretation by the jury. *See, e.g., Larson v. Jo Ann Cab Corp.*, 209 F.2d 929 (2d Cir.1954). "In an ordinary civil suit ... words like 'convince' ... should be shunned in a jury charge," *id.* at 935, and to tell the jury that it must be able to say "confidently" that the evidence is in the plaintiff's favor seems quite likely to require more than a preponderance. Instead, the court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it "find[s] that the scales tip, however slightly, in favor of the party with th[e] burden of proof" as to that fact. Sand, *Modern Federal Jury Instructions* ¶ 73.01, at 73–4 (1992).

## CONCLUSION

The judgment of the district court is vacated, and the matter is remanded for a new trial not inconsistent with the foregoing.

Costs to plaintiff.