**Orlando CABRERA, Linda McCoggle, Jeannette Ramsey, on behalf of themselves, and all others similarly situated, Open Housing Center, Inc., Plaintiffs–Appellees, Cross–Appellants,**

v.

**Jeno JAKABOVITZ, Benjamin Breitman, Defendants–Appellants–Cross–Appellees,**

**Emanuel Fischler, doing business as AM Realty Co., James Siegel, Carl Matos, also known as Carlos Matos, Defendants.**

Nos. 317, 318 and 510, Dockets 93–7261(L), 93–7371 and 93–7409.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1993.

Decided May 5, 1994.

Marvin H. Wolf, Dix Hills, NY (Alan F. Katz, Jeffrey M. Garber, on the brief), for defendant-appellant-cross-appellee Jakabovitz.

Howard B. Schoenfeld, New York City (Hiller & Frank, Milwaukee, WI; Leonard W. Wagman, Snow, Becker & Krauss, on the brief), for defendant-appellant-cross-appellee Breitman.

Lynn E. Judell, New York City (David M. Brodsky, Leslie A. Rubin, Sofia C. Hubscher, Schulte Roth & Zabel, on the brief), for plaintiffs-appellees, cross-appellants.

Before: NEWMAN, Chief Judge, FEINBERG, Circuit Judge, and POLLAK,* District Judge.

JON O. NEWMAN, Chief Judge:

This appeal presents important issues concerning the framing of jury instructions in all types of discrimination cases. The appeal also presents specific issues concerning the circumstances under which landlords may be found liable for discrimination undertaken either directly by them or by real estate brokers acting as their agents. The issues arise on an appeal from a judgment of the District Court for the Eastern District of New York (Arthur Spatt, Judge) entered after a jury verdict, awarding compensatory and punitive damages in a suit alleging racial discrimination in the rental of housing. We affirm, except for one aspect of the calculation of attorney's fees, as to which we remand for further consideration.

## Background

In 1987, the Open Housing Center, a not-for-profit organization whose primary purpose is to promote equal opportunity in housing in New York, began an investigation of AM Realty, a real estate brokerage firm in Brooklyn, to see whether it was complying with a prior consent decree not to discriminate in providing housing services. On four occasions from February to July 1987, the Center sent a pair of "testers" [1] of different races to AM Realty's offices to inquire about renting apartments in certain Brooklyn neighborhoods. The two testers in each pair presented a similar rental "profile," each claiming to have a family composition and income similar to the person with whom he or she was paired. In each of the tests, the realty agency directed the White tester in each pair to look at apartments in predominantly White neighborhoods, but directed the African–American or Latino tester to look at

---

\* The Honorable Louis H. Pollak of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. "Testers" are individuals who, without the intent to rent an apartment, pose as renters for the

purpose of collecting evidence of unlawful steering away of prospective minority purchasers by real estate agents.

*Ragin v. Harry Macklowe Real Estate,* 6 F.3d 898, 904 (2d Cir.1993).

apartments in predominantly minority neighborhoods, or, alternatively, informed the minority tester that no apartments were available at all.

With this evidence of "racial steering"[2] by the broker, the Center then turned to examine which landlords employed this particular broker. The Center discovered that Jeno Jakabovitz and Benjamin Breitman were among the landlords who listed their apartments with AM Realty. Jakabovitz owns fourteen buildings in Brooklyn; Breitman owns two. The Center then sent a pair of testers directly to Jakabovitz's offices to inquire about available apartments. Again, the White tester was offered an apartment, while the African–American tester was not.

In the first test, the Open Housing Center sent Orlando Cabrera, a Latino tester, to AM Realty on February 1, 1987. Cabrera asked AM Realty broker Carl Matos for a one-bedroom apartment in Sheepshead Bay or Kings Highway. After making some phone calls, Matos informed Cabrera that no apartments were available. Later that same day, Cindy Reiman, a White tester, arrived and requested a one-bedroom in Sheepshead Bay or Midwood. She spoke with a different broker, James Siegel, who offered her three apartments in Sheepshead Bay, and even drove her to one of the apartments in his car.

In the second test, Ronald Luckett, an African–American tester, inquired on March 6, 1987, at AM Realty about a one-bedroom or studio apartment in Sheepshead Bay or Midwood. Broker Carl Matos offered him an apartment in Flatbush, a predominantly African–American and Latino area. Susan Hamovitch, a White tester, arrived two hours later and met with broker James Siegel. She asked for a one-bedroom or "junior four" apartment[3] in Sheepshead Bay or Midwood. Siegel offered her a "junior four" in Sheepshead Bay and also a one-bedroom apartment

in a building owned by Breitman in Kensington, a neighborhood she had not requested. Hamovitch was also offered a "junior four" apartment in Sheepshead Bay. Breitman says that the apartment in his building to which Hamovitch was referred was later rented to a Latino person.

In the third test, Linda McCoggle, an African–American tester, went to AM Realty on May 2, 1987. Upon entering AM Realty's offices, she was informed by the receptionist that no one was available to see her. The receptionist gave her Carl Matos's business card. McCoggle called AM Realty that same day and spoke with Matos, who told her that no apartments were available, and asked her to call back later in the week. McCoggle did call Matos back, but was again told that there was nothing available. McCoggle called a third time and left a message, but no one returned her call. Rachel Schwartz, a White tester, also arrived at AM Realty's offices on May 2, 1987, a short time after McCoggle's visit. She met with Marianne Hascup who told her that both rental agents were out, but gave her Siegel's card and assured her that apartments were available. Siegel called Schwartz a few days later and gave her six apartment listings. He spoke with her the next day and added two new apartments. He subsequently called Schwartz two more times to ask whether Schwartz was interested in any of the apartments.

In the fourth test, Augustin Hinkson, an African–American tester, met with Siegel at AM Realty's offices on July 24, 1987. Siegel told Hinkson that there were no apartments available in Sheepshead Bay, Kings Highway, or Midwood. After returning home, Hinkson called AM Realty and left a message for Siegel, who never called back. Nancy Steifel, a White tester, arrived at AM Realty's offices later that same day. She

---

**2.** Racial steering is a practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups.

*Havens Realty Corp. v. Coleman,* 455 U.S. 363, 366 n. 1, 102 S.Ct. 1114, 1118 n. 1, 71 L.Ed.2d 214 (1982) (citation omitted).

**3.** A "junior four" apartment was described as one having a separate dining room and a bedroom.

also requested a one-bedroom in Kings Highway and Sheepshead Bay. Hascup offered her two listings for one-bedroom apartments in those areas.

In the final test, the Open Housing Center sent testers directly to Jakabovitz's offices. Phyllis Spiro, a White tester, went to Jakabovitz's offices on July 29, 1987, and asked for an apartment in Kings Highway or Sheepshead Bay. Jakabovitz told her that there was a one-bedroom apartment available in Kings Highway. Jakabovitz said that the apartment's current tenant had recommended for tenancy a young man who had given Jakabovitz a deposit, but that he "didn't care for that young man," and that if she acted quickly he would rent the apartment to her instead. Jakabovitz also asked Spiro if she was interested in an apartment in Bensonhurst, and she replied that she was not. After Spiro left Jakabovitz's office she went to a location about three blocks away where she had arranged to meet Jeannette Ramsey, an African–American tester. Ramsey then went to Jakabovitz's office and explained that she was looking for an apartment in Kings Highway or Borough Park. Jakabovitz told her that there was nothing available in the areas she requested, but asked if she would be interested in "Cypress." This was apparently a reference to Cypress Hills, a predominantly African–American neighborhood. Ramsey did not indicate any interest in this neighborhood but instead asked Jakabovitz to contact her if anything else became available. Ramsey testified that Jakabovitz never asked her about the size of the apartment she wanted, how much she was willing to pay, or if she was interested in an apartment in Bensonhurst, nor did he call her to follow up.

To recapitulate, the White apartment seekers who followed minority testers Cabrera, McCoggle, and Hinkson were informed of apartments available in buildings owned by Jakabovitz, and the White tester who followed minority tester Luckett was told that there was an apartment available in a building owned by Breitman. Meanwhile, none of the minority testers was informed of any apartments in any building owned by either Jakabovitz or Breitman. When Jakabovitz was tested directly, he informed White tester Spiro that an apartment was available in the area that she had requested, but told African–American tester Ramsey less than an hour later that no apartment was available in that same area. Jakabovitz admitted at trial that in 1987 he had no African–American tenants in any of the buildings he owned in the predominantly White areas at issue.

Based on the results of these tests, the Open Housing Center, along with minority testers Orlando Cabrera, Linda McCoggle, and Jeannette Ramsey, sued Jakabovitz and Breitman, AM Realty, and AM Realty's brokers, for violating Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act" or "Title VIII"), 42 U.S.C. §§ 3601–19; the Civil Rights Act of 1870 ("section 1981"), 42 U.S.C. § 1981, involving the right to enter into a contract; and the Civil Rights Act of 1866 ("section 1982"), 42 U.S.C. § 1982, involving the right to lease real property.

After a two-week trial, the jury rendered a verdict largely in plaintiffs' favor. It found that Matos discriminated against minority testers Cabrera and Luckett in violation of Title VIII, but determined that he did not discriminate against plaintiff McCoggle. The jury found that Siegel discriminated against minority tester Hinkson in violation of Title VIII, and that Jakabovitz discriminated against minority tester Ramsey in violation of Title VIII and sections 1981 and 1982.

The jury's special verdict also decided issues of vicarious liability. The jury found that both Siegel and Matos acted within the scope of their authority and in furtherance of the business of Emanuel Fischler, who was doing business as AM Realty. The jury further found that Fischler acted as the agent of Jakabovitz and Breitman with regard to the events at issue. By these findings, the jury held the landlords liable for the discriminatory acts of their agent, AM Realty.

The jury awarded only nominal damages to the two prevailing plaintiff-testers, Cabrera and Ramsey, awarded the Open Housing Center compensatory and punitive damages against the brokers and against Jakabovitz, but declined to award even nominal damages against Breitman. The Court directed the

jury to deliberate further on the issue of damages against Breitman, but the jury again refused to award even nominal damages against Breitman. Because the jury verdict held Breitman liable for the discriminatory acts of appellants but failed to award even nominal damages, the Court modified the award to provide for nominal damages of one dollar against Breitman. Judgment was entered imposing liability as follows: (a) upon Jakabovitz for $8,000 in compensatory damages and $1,000 in punitive damages in favor of the Open Housing Center, and $1 in nominal damages in favor of Cabrera and Ramsey, (b) upon Breitman for $1 in nominal damages in favor of the Open Housing Center, (c) various sums against the broker-defendants, who have not appealed, (d) injunctive and affirmative relief, and (e) attorney's fees. *See Cabrera v. Fischler*, 814 F.Supp. 269 (E.D.N.Y.1993). Only the landlords appeal. Plaintiffs cross-appeal from the Court's reduction in their attorney's fees request and its denial of the costs the Open Housing Center will incur in monitoring the landlords' compliance with the equitable relief ordered by the Court.

## Discussion

### I. Direct Liability of Jakabovitz

Jakabovitz was held directly liable under Title VIII and sections 1981 and 1982 for refusing to show an available apartment to plaintiff-tester Jeannette Ramsey. Jakabovitz challenges the imposition of direct liability against him on the grounds that (1) the Court erred in its instructions to the jury regarding the burden of proof, and (2) Ramsey failed to present sufficient evidence to sustain her burden of proving discrimination.

### A. Jury instructions on burden of proof

Jakabovitz contends that the District Court erred in instructing the jury regarding (1) the parties' respective burdens in connection with proving discrimination and (2) the possibility of mixed motives on the part of the defendant. Much of the difficulty in this case arises from the fact that language used by appellate courts to formulate burdens of proof and production in the context of bench trials has been imported uncritically into jury charges. Though the burdens of proof and production do not vary from bench to jury trials, the standards that must guide a judge during a bench trial are not necessarily helpful or even appropriate for inclusion in jury charges. The bench trial judge acts both as a determiner of whether a case meets the legal requirements for decision by a fact-finder and as a fact-finder. A jury performs only the latter function. It therefore need not be told about concepts that guide the judge in determining whether the case merits jury consideration. At the same time, it must be told what legal principles to apply depending on the different ways it might view the evidence. Though we have previously pointed out that the jury trial context creates problems that do not arise in bench trials, *see Ostrowski v. Atlantic Mutual Insurance Cos.*, 968 F.2d 171, 186 (2d Cir.1992), lawyers are still prone to include in requested jury charges language that was written by appellate courts in the context of bench trials—language that is at best irrelevant, and at worst misleading to a jury.[4] Their pen-

---

4. We have made this point before, *see Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 85 (2d Cir.1983) ("'[P]roposed instructions, couched in such lawyerly cant as '*prima facie* case' and 'shifting burden of proof,' would only have confused the jury.''), but it seems not to have been followed. Other courts have provided similar admonitions. *See, e.g., Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 731 (8th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *Messina v. Kroblin Transportation Systems, Inc.*, 903 F.2d 1306, 1308–09 (10th Cir.1990); *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1137 (4th Cir.1988); *but see Lynch v. Belden & Co.*, 882 F.2d 262, 265–66 (7th Cir.1989) (approving use of instruction setting out *McDonnell Douglas* analysis, including references to

"*prima facie* case"), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1134, 107 L.Ed.2d 1040 (1990).

Recently, the First Circuit, which had earlier led the battle against instructing the jury as to the intricacies of the *McDonnell Douglas* framework in *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979), has reconsidered its position and embraced such instructions:

Although this framework was considered complicated and cumbersome when it was first used in *McDonnell–Douglas*, with repeated use courts have become more comfortable with it, both for their own use in ruling on Title VII claims and for the jury's use in ruling on intentional discrimination. *See Loeb v. Textron, supra.* It is a straightforward way of

chant for doing so has regrettably been abetted by the inclusion of such language in some model instructions.[5]

This case well illustrates the problems that can arise when such language is incorporated in a jury charge. For example, the jury charge included references to "a *prima facie* case," to the defendants' "burden" of producing evidence of a nondiscriminatory reason for their actions, and to the fact that when a defendant has produced evidence of a nondiscriminatory reason for its actions, "then it is the plaintiffs' burden to persuade you by a preponderance of the evidence that the defendants intentionally discriminated against the plaintiffs because of the plaintiffs' race." Though these statements faithfully endeavored to track the three-step formulation of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), they created a distinct risk of confusing the jury. "*Prima facie* case" is not a term readily understood by jurors, and it has at least two meanings for judges. *See id.* at 254 n. 7, 101 S.Ct. at 1094 n. 7. Moreover, the distinction between burden of persuasion and burden of production is not familiar to jurors, and they may easily be misled by hearing the word "burden" (though referring to a burden of production) used with reference to a defendant in an

explanation of that part of the charge that concerns a plaintiff's burden of persuasion. Finally, telling the jury that the burden of persuasion "shifts back" to the plaintiff after the defendant has satisfied its burden of production runs the risk of creating extra confusion.

■ Basically, none of these phrases needs to be included in a jury charge in a typical case involving a claim of adverse action based on improper motivation, regardless of the state of the evidence. If the facts of the *prima facie* case are undisputed and the defendant has produced no evidence to rebut the *prima facie* case, no jury charge is needed because the plaintiff is entitled to judgment as a matter of law. *See St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993).[6] If the facts of the *prima facie* case are disputed and the defendant has produced no rebuttal evidence, then the jury needs to be told that if it finds the following facts, the plaintiffs are entitled to prevail: (1) the plaintiff is a member of the class protected by the statute, (2) the plaintiff sought and was qualified for an apartment (or a job, in an employment discrimination case), (3) the plaintiff was denied the opportunity to rent the apartment (or obtain the job), and (4) the apartment (or job) remained available thereafter. *See id.*[7] However, there is no need to

---

explaining how to consider whether there is intentional discrimination in situations where such discrimination is not likely to be overt. *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 200 (1st Cir.1987). While we agree that courts have become "more comfortable" with the *McDonnell Douglas* framework since the time *Loeb* was decided, we do not see why increased *judicial* familiarity with the *McDonnell Douglas* standards justifies an explication of these standards, and particularly the legalistic terms in which they are expressed, in instructions to a jury.

**5.** Some jury instruction manuals, however, either omit the burden-shifting language of *McDonnell Douglas* and *Burdine, see, e.g.,* 3 Edward J. Devitt *et al.,* Federal Jury Practice and Instructions: Civil § 104.04, notes (Supp.1993), or specifically recommend against its inclusion, *see, e.g., Manual of Modern Civil Jury Instructions for the District Courts of the Eighth Circuit* 74 (West 1993) ("It is unnecessary and inadvisable to instruct the jury regarding the three-step analysis of *McDonnell Douglas.*").

**6.** "At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine. None does if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a prima facie case, and (2) the defendant has failed to meet its burden of production—*i.e.,* has failed to introduce evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action. In that event, the court must award judgment to the plaintiff as a matter of law under Federal Rule of Civil Procedure 50(a)(1) (in the case of jury trials) or Federal Rule of Civil Procedure 52(c) (in the case of bench trials)." *Hicks,* — U.S. at —, 113 S.Ct. at 2748 (emphasis in original; citations omitted).

**7.** "If the defendant has failed to sustain its burden [of production] but reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer." *Id.*

label these four facts as constituting a *"prima facie* case," and it will normally not aid the jury to use that phrase.

 If the defendant has met its burden of producing evidence that, if taken as true, would rebut the *prima facie* case, a threshold matter to be decided by the judge, the jury need not be told anything about a defendant's burden of production. In that event, whether or not the facts of the plaintiff's *prima facie* case are disputed, the jury needs to be told two things: (1) it is the plaintiff's burden to persuade the jurors by a preponderance of the evidence that the apartment (or job) was denied because of race (or, in other cases, because of some other legally invalid reason), *see id.* at ——, 113 S.Ct. at 2749,[8] and (2) the jury is entitled to infer, but need not infer, that this burden has been met if they find that the four facts previously set forth have been established and they disbelieve the defendant's explanation, *see id.*[9] There is no need to inform the jury that the defendant had a burden of production because it is no longer relevant. *Id.*[10] There is also no need to refer to a burden shifting back to the plaintiff because, if the case requires submission to the jury,[11] all the jury needs to be told about the plaintiff's burden of proof is that the burden of persuasion as

to discrimination is on the plaintiff; the presumption that triggered the defendant's burden of production has "drop[ped] out of the picture." *Id.*

 What has been said to this point concerns the typical case where the parties dispute whether the adverse action taken by the defendant was motivated by an impermissible factor (such as race or ethnicity) or a permissible factor (such as inability to pay rent or unfitness for employment). In some cases the evidence permits the trier to find that more than one factor motivated the adverse action. In that event, it will be appropriate at the defendant's request, and sometimes at the plaintiff's request, *see Ostrowski,* 968 F.2d at 181, to instruct the jury concerning the defendant's affirmative defense of dual motivation, *i.e.,* that the defendant would have taken the adverse action on the basis of a permissible reason even if the impermissible reason had not existed. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (opinion of Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ.); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Tyler v.*

---

at ——, 113 S.Ct. at 2748 (emphasis in original). In a footnote to this sentence, the Court continues: "If the finder of fact answers affirmatively— if it finds that the prima facie case *is* supported by a preponderance of the evidence—it *must* find the existence of the presumed fact of unlawful discrimination and *must,* therefore, render a verdict for the plaintiff." *Id.* at ——, 113 S.Ct. at 2748 n. 3 (emphasis in original).

8. "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him]' because of his race." *Id.* at ——, 113 S.Ct. at 2749 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

9. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted

that, upon such rejection, '[n]o additional proof of discrimination is *required.*'" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749 (emphasis in original) (footnote and citation omitted).

10. "If, on the other hand, the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.... The presumption, having fulfilled its role in forcing the defendant to come forward with some response, simply drops out of the picture." *Id.* at ——, 113 S.Ct. at 2749 (citation omitted).

11. A case warrants submission to a jury if the plaintiff's proof is sufficient to create factual issues as to discrimination, whether or not the defendant has discharged its burden of production. If the plaintiff's proof is insufficient to create factual issues as to discrimination, the defendant is entitled to judgment. If the plaintiff's proof is undisputed as to the four factors establishing a *prima facie* case of discrimination and the defendant has failed to discharge its burden of production, the plaintiff is entitled to judgment.

*Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). In such cases, the jury should be told that the burden of proof remains on the plaintiff to prove that the adverse action was motivated, at least in part, by an impermissible reason, and that, if the jury finds that the plaintiff has sustained this burden, then the defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of the permissible reason alone. Of course, if the jury does not find that the plaintiff has sustained its burden, the jury should not go on to consider whether the defendant has sustained its burden concerning the affirmative defense. It might be useful to explain to the jury that the fact-finding as to whether the plaintiff has sustained its burden concerns what actually happened, whereas the fact-finding as to whether the defendant has sustained its burden on the affirmative defense concerns a hypothetical situation.

■■■■ With these considerations in mind and recognizing that the framework of burdens fashioned in Title VII cases is fully applicable to Title VIII housing discrimination cases, *see Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036–39 (2d Cir.1979), we turn to the instructions given in this case. Jakabovitz's first objection is that the Court erred in instructing the jury that he bore the burden of establishing that race played no role in his decision not to show an apartment to the African–American or Latino tester. In informing the jury as to the defenses available to a defendant if the plaintiffs established a discriminatory motive, the Court included the following instruction:

> [A] defendant must establish that his decision not to offer an available apartment to plaintiff was based completely on considerations other than race or national origin, that is[,] the defendant must show that race played no role whatsoever in his decision not to afford the plaintiff access to an available apartment.

Jakabovitz timely objected to this instruction, saying, "I respectfully except to the portion of your Honor's charge where it said the defendant has to prove that race played no role." His objection was overruled.

■■■■ Under *McDonnell Douglas,* the defendant does not bear the burden of establishing that race was not a factor in his or her decision. Instead, the plaintiff always bears the ultimate burden of proving discrimination. While we agree with Jakabovitz that the portion of the charge excerpted above was erroneous, we think that the charge as a whole properly apprised the jury that the plaintiff bore the burden of establishing discrimination. The jury charge repeatedly made clear the plaintiff's burden of proof in the following passages:

> To establish a case under Section 1981, the plaintiffs must establish by a preponderance of the evidence that the defendants were motivated by a racially discriminatory purpose, that is, the plaintiffs must prove that the defendants intentionally and purposefully discriminated against them because of race.

> . . . . .

> You should also understand that the plaintiffs must prove that the defendants actually were motivated by a racially discriminatory purpose.

> . . . . .

> [Plaintiffs] must establish by a preponderance of the evidence that a defendant intentionally discriminated against them on the basis of race. You should consider the plaintiffs' circumstantial evidence along with all of the evidence in the case and determine whether it proves by a preponderance of the evidence that a defendant was motivated by a racially discriminatory purpose.

> . . . . .

> By producing evidence which puts the plaintiffs' claim in question, a defendant has fulfilled his or her burden to offer a non-discriminatory reason for not showing the black plaintiffs an apartment in a white area and then it is the plaintiffs' burden to persuade you by a preponderance of the evidence that the defendants intentionally discriminated against the plaintiffs because of the plaintiffs' race. . . .

By meeting this intermediary burden, by offering a non-discriminatory reason or reasons, a defendant has shifted the burden of persuasion back to the plaintiffs.

. . . . .

If you find that the plaintiffs have sustained their burden by a preponderance of the evidence that a defendant purposefully or intentionally discriminated against a plaintiff on the basis of her race, you must then consider the issue of damages....

In order to prove a violation of Section 1982, the plaintiffs must establish by a preponderance of the evidence that the discrimination of which they claim was purposeful and intentional.

Because of the Court's extensive and repeated instructions that the plaintiff bore the burden of proving discrimination, we believe that the jury could not have been led astray by the Court's brief comment to the contrary. When the jury instructions are considered as a whole—just as the jury heard them—the placement of the burden of proof onto the shoulders of the plaintiffs becomes clear. *See Ressler v. White,* 968 F.2d 1478, 1479 (2d Cir.1992).

■ Jakabovitz also objects to two other jury instructions dealing with proof of discrimination. First, he objects to the Court's instruction that he bore the burden of *proving* that he had a legitimate, nondiscriminatory reason for not showing the apartment to the minority tester. Jakabovitz, of course, bore only the burden of *producing* evidence in support of his claim of a legitimate, nondiscriminatory reason for his refusal to show the apartment to a minority person. Jakabovitz points to the following language in the instructions:

It is the defendants' burden to persuade you on this point, that means a defendant must establish by a preponderance of the evidence that there was a non-discriminatory reason for not offering the apartments to the plaintiff testers.

If this instruction had related to the portion of the jury's consideration that precedes consideration of the defendant's affirmative defense, it would have been erroneous. The sentence is worded in terms of actual intent, rather than the hypothetical state of mind contemplated by *Price Waterhouse.* However, the passage followed immediately after a passage that unmistakably referred to the affirmative defense, as to which the burden quite properly was assigned to the defendants. We do not need to decide whether this passage was erroneous because no objection was made to it, and it could easily have been related solely to the affirmative defense if the Court had been alerted to the possible ambiguity. *See* Fed.R.Civ.P. 51. "The purpose of the Rule is to require the parties to give the trial court an adequate opportunity to cure any error in the instructions before the jury deliberates." *Ostrowski,* 968 F.2d at 177 (citation omitted); *see also Lavoie v. Pacific Press & Shear Co.,* 975 F.2d 48, 55 (2d Cir.1992); *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992).

■ Second, Jakabovitz protests the Court's inclusion of any instructions concerning the affirmative defense. Again, the point is waived in the absence of objection, and, in any event, a dual motivation instruction would not have been improper on the facts of this case. *See Ostrowski,* 968 F.2d at 181.

## B. Sufficiency of the evidence

■ Jakabovitz's challenge to the sufficiency of the evidence presented by plaintiff Ramsey proceeds from the premise, which we accept, that Jakabovitz discharged his burden of producing evidence to rebut her *prima facie* case. He produced evidence that rebutted Ramsey's showing that the apartment in question was available when she applied to rent an apartment. He asserts that the apartment that he had offered to White tester Spiro was not available an hour later when African–American tester Ramsey arrived because it had been rented to someone else in the meantime. Jakabovitz presented evidence that someone named Andrew Lubrano had come in during that hour to add $200 to a $50 deposit he had made on the apartment two days earlier. Jakabovitz argues that his presentation of a legitimate, nondiscriminatory reason for his failure to show the apartment placed the burden on plaintiff Ramsey to produce *more* evidence of discrimination. Her failure to present more

evidence at that point, Jakabovitz continues, required judgment as a matter of law in his favor.

Jakabovitz offered this argument in a Fed. R.Civ.P. 50(b) motion three weeks after the jury found him directly liable for racial discrimination. The Court denied the motion because it said that Jakabovitz had failed to make the necessary Rule 50(a) motion for judgment as a matter of law at the close of the evidence. On appeal, Jakabovitz contends that the Court ignored a motion that he filed on April 28, 1992, a motion filed, he points out, before the case went to the jury. Jakabovitz fails to note that that motion was made not just before the case went to the jury, but *before trial began*. Rather than deciding whether the trial court should have treated that motion as a timely Rule 50(a) pleading, we prefer to dispose of Jakabovitz's insufficiency claim on the merits.

Jakabovitz misreads the Supreme Court's statement in *Hicks* that once a defendant produces evidence of a legitimate, nondiscriminatory reason for his or her action, the plaintiff must then establish that the defendant's actions were intentionally discriminatory. Jakabovitz takes this statement as requiring the plaintiff to adduce *additional* evidence after the defendant's production—evidence beyond that presented in the plaintiff's *prima facie* case. Justice Scalia took pains to preclude such an interpretation of the Court's decision when he observed that, upon rejection of the defendant's proffered reasons for its action, "no additional proof of discrimination is required." *Hicks*, —— U.S. at ——, 113 S.Ct. at 2749 (emphasis, internal quotation marks & citation omitted). Thus, Ramsey did not fail to offer sufficient evidence of discrimination by not presenting more evidence after Jakabovitz endeavored to provide a nondiscriminatory reason for his actions.

The jury's verdict holding Jakabovitz liable for discriminating against Ramsey demonstrates that the jury believed that Jakabo-

vitz's explanation was pretextual. The jury may have felt that Jakabovitz's claim that the apartment was no longer available when Ramsey arrived was unbelievable in light of the fact that Lubrano—the person to whom the apartment had supposedly been rented—was never allowed to move in.

## II. Vicarious Liability of the Landlords

 To hold Breitman and Jakabovitz vicariously liable for AM Realty's discriminatory practices, the Open Housing Center must establish that they employed AM Realty as their agent. *See Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir.1985) ("In cases of racial discrimination in housing, a principal is liable for the wrongful acts of its agents."). Judge Spatt submitted the agency question to the jury, which found, in a special verdict, that AM Realty and its brokers acted as agents for both Breitman and Jakabovitz. The landlords contend that the District Court should not have submitted the agency question to the jury. Alternatively they argue that the Court erred in its instructions to the jury regarding the law of agency.

### A. The jury finding of agency

 The landlords dispute the jury's finding of agency, arguing that AM Realty served not as their agent, but rather as the agent of the prospective tenants. Before we can determine whether AM Realty could be found to be the landlords' agent, we need to determine what standard of review we should apply to this question.

 The Open Housing Center urges that the question whether an agency relationship exists is a factual question, a jury's answer to which we review only for clear error. The landlords, on the other hand, maintain that it is a legal question, a trial court's answer to which we are obliged to review *de novo.* We believe that the question of whether an agency relationship exists is a mixed question of law and fact.[12] We

12. The parties' disagreement over the appropriate standard of review is understandable in light of the confusing array of judicial pronouncements on the issue. *Compare Sun Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1036 (11th Cir.1991) ("The existence of an agency relation-

ship is an issue of fact[.]"); *Metco Products, Inc. v. NLRB,* 884 F.2d 156, 159 (4th Cir.1989) ("Generally, the existence and scope of agency relationships are factual matters."), *with Jenkins v. Leonardo,* No. 90–Civ.–3266, 1992 WL 176665, *10, n. 5, 1992 U.S. Dist. LEXIS 10986, *14, n. 5

review the District Court's conclusion on the issue only to see whether plaintiffs introduced evidence which, if credited by the jury, would justify a finding of agency.[13] A determination that an agency relationship exists requires the application of a legal standard to a set of historical facts. "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Restatement (Second) of Agency § 1 cmt. b (1958). Unless the facts are insufficient to support a finding of agency or there is no dispute as to the historical facts, the question of agency should be submitted to the jury so that it may apply the applicable legal standard, as set forth in the instructions, to the facts, as the jury finds them.[14] See Slotkin v. Citizens Casualty Co., 614 F.2d 301, 317 (2d Cir.1979), cert. denied, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980) ("[Plaintiffs'] burden of proof to avoid dismissal of the complaint was not to prove the agency but merely to adduce sufficient evidence to take the issue to the jury.").

We first review the evidence presented by the plaintiffs with regard to the relationship between AM Realty and Jakabovitz. Jakabovitz supplied AM Realty with listings of vacant apartments with the understanding that AM Realty would refer prospective tenants to him for those apartments. Jakabovitz instructed AM Realty to refer only those applicants who met his income requirements (namely, that a tenant's weekly income equalled or exceeded his or her monthly rent) and also his criteria for the number of persons occupying an apartment (roughly, no more than two persons in a studio, and no more than three in a one bedroom apartment). Jakabovitz provided copies of his rental application forms to AM Realty, and AM Realty employees often personally delivered completed application forms to Jakabovitz's office. On those occasions when Jakabovitz was unavailable, leases would be signed in AM Realty's offices, and AM Realty would accept the rent and security deposit on Jakabovitz's behalf. Realty brokers set up appointments for Jakabovitz to meet with prospective applicants, even at times driving applicants to Jakabovitz's office. When Jakabovitz accepted a rental application from a person referred by AM Realty, AM Realty brokers would contact the applicant to tell him or her that the application had been approved.

AM Realty had a larger role in renting Breitman's apartments than it had in renting Jakabovitz's apartments. Breitman too supplied AM Realty with listings of vacant apartments, and expected it to refer only prospective tenants who met his income requirements and his criteria for the number of persons who would occupy the apartment. But Breitman also required AM Realty to run credit checks on prospective tenants. Furthermore, Breitman asked AM Realty to contact applicants' prior landlords to determine whether the applicants had had any difficulties in paying their rent or in their

---

(S.D.N.Y. July 16, 1992) ("[T]he determination whether these facts give rise to an inference that an agency relationship was created is an issue of law which does not require deference to the conclusion of the trial court."), aff'd, 991 F.2d 1033 (2d Cir.), cert. denied, — U.S. —, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993).

**13.** In order to avoid predicating liability for Title VIII violations on the vagaries of state law, the question whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law. See Chicago v. Matchmaker Real Estate Sales Center, Inc., 982 F.2d 1086, 1097 (7th Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); Northside Realty Associates, Inc. v. United States,

605 F.2d 1348, 1354 n. 13 (5th Cir.1979); Marr v. Rife, 503 F.2d 735, 740 (6th Cir.1974).

**14.** One treatise explains:

Agency is a question of fact to be determined by the jury or other trier of facts unless no competent evidence legally sufficient to prove it has been introduced or the material facts from which it is to be inferred are undisputed and only one conclusion can be reasonably drawn therefrom....

On the other hand, agency is a question of law for the court where the material facts from which it is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case.

3 C.J.S. Agency § 547 (1973) (footnotes omitted).

interactions with other tenants. Like Jakabovitz, Breitman provided AM Realty with rental applications for his apartments. But unlike Jakabovitz, Breitman usually allowed the lease to be signed in AM Realty's offices without being present at the signing. In fact, Breitman often never met with the applicants at any time before they moved in, and instead relied on AM Realty brokers to answer any questions the future tenants might have about the lease.

 All of AM Realty's brokers (who are also defendants in this case) admitted in their answers that they acted as the landlords' agents, except for one (Siegel) who neither admitted nor denied that he had acted as the landlords' agent. At trial, however, Fischler, the key figure in AM Realty, denied that he had served as the landlords' agent, explaining his earlier concession as the handiwork of his former attorney. Breitman himself admitted in a number of pretrial pleadings that AM Realty served as his agent, but also disavowed that admission at trial. While trial testimony that controverts an admission contained in a pleading may reduce the weight given to that admission, see *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir.1984), the jury is free to disregard the later retraction if it finds the retraction not credible. A person's statement that he was an agent of another may not establish that relationship as an incontrovertible fact, but it can help establish that that individual himself believed that he was acting on another's behalf and under another's control. See *Slotkin*, 614 F.2d at 316 (" '[A] person can properly testify as to the facts which it is alleged constitute his authority, and his testimony can be introduced either by or against the alleged principal.' " (citation omitted)); Restatement (Second) of Agency § 285 cmt. a (1958). Likewise Breitman's admission in the pleadings that AM Realty was his agent may help establish that he had agreed that AM Realty would act as his agent.

 As mentioned earlier, whether an agency relationship exists "depends on the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Id.* § 1 cmt. b. Here, there was ample evidence from which the jury could have inferred that the landlords had manifested a desire to have AM Realty act on their behalf in renting their apartments, and that AM Realty had accepted this agency. The landlords provided AM Realty with listings of their apartments and their criteria for acceptable tenants. AM Realty engaged in the business of renting these apartments and in "screening" the applicants to make sure that they met Breitman's and Jakabovitz's specifications. There was sufficient evidence also to indicate that the landlords controlled AM Realty's activities in referring candidates for these apartments. Both landlords had the power to deny further listings to AM Realty if the brokerage referred unacceptable applicants for the apartments. Breitman had in fact at one point cut off AM Realty from receiving further listings from his apartments, but had later reinstated the brokerage.

Appellants urge that the Supreme Court's decision in *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), requires us to reverse the finding of agency. In *General Building*, the Court held that *respondeat superior* was not available where plaintiffs had presented no evidence that certain trade associations and construction employers controlled a union and a training committee. Here, however, as we have seen, plaintiffs presented evidence that the landlords dictated the qualifications for prospective tenants, and conditioned the realtor's receipt of future apartment listings on its abiding by the landlords' specifications. These facts also distinguish this case from *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 447 F.Supp. 838 (E.D.N.Y.1978), a case in which the District Court ruled that no agency relationship existed between brokers and a real estate multiple listing service. The Court held that a service that provided property listings to brokers was not responsible for the brokers' racial steering because the brokers did not "act on behalf, at the behest, or for the benefit" of the listing service, and because the service did not control

the sales of the brokers, but only conditioned its provision of listings to the brokers. *Id.* at 842. Unlike *Wheatley Heights,* the brokers in the instant case acted pursuant to the landlords' directives to refer only acceptable tenants and the landlords benefitted from the brokers' service by renting their vacant apartments. Furthermore, the landlords not only conditioned the receipt of future apartment listings, but also required the brokers to perform various services, including screening applicants according to the landlords' rental criteria, showing them available apartments, and shepherding them through the application process. Plaintiffs presented sufficient evidence regarding the existence of an agency relationship to take the issue to the jury.

■ The landlords further argue that the brokers could not have been their agents because the brokers earned their commissions from prospective tenants, not from the landlords. The fact that the tenants paid the broker does not preclude a finding that the broker acted as the owner's agent in renting the apartment.[15] The District Court presented the question of agency to the jury, which found that the evidence demonstrated that AM Realty had served as the landlords' agent. We cannot say that the evidence was insufficient as a matter of law to allow this conclusion.

Finally, the landlords contend that imputing liability to a landlord for the discriminatory practices of a real estate broker contravenes what they believe to be a public policy favoring the use of real estate brokers. We believe that our decision will not harm the business of renting apartments, whether or not brokers are used. First, public policy certainly does not favor the use of brokers who engage in the repugnant practice of racial steering. Our decision will only increase the costs of using brokers who discriminate, and thereby potentially reduce such discrimination. Second, landlords need not be dissuaded from using brokers because of their fear that they will be held liable if the brokers discriminate. Landlords will be able to allay this concern by looking over the racial composition of the broker's referrals for any sign of discrimination. While this examination will not prove that a broker is discriminating, it will at least alert the landlord to that possibility and allow the landlord to take appropriate steps to avert such discrimination. Finally, instead of frustrating public policy goals, we believe that our decision will actually further the purposes of the Fair Housing Act:

> The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with "truly integrated and balanced living patterns."

*Woods–Drake v. Lundy,* 667 F.2d 1198, 1201 (5th Cir.1982) (quoting *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972)) (quoting statement of Senator Walter Mondale, 114 Cong.Rec. 3422)).[16]

B. Jury instructions on agency

■ Even if submitting the question of agency to the jury was not error, there may have been error in the jury finding of agency if the court improperly instructed the jury as

---

15. This point was made in an unreported decision rendered some years ago by Judge Conner:

> The Court rejects the suggestion that because Kahan [the broker] is paid and technically employed by prospective tenants, the owners could not be found to "control" Kahan, and are therefore immune from liability. While this fact may make it more difficult for plaintiffs to prove that Kahan acted as the owners' agent, the Court cannot say at this stage that plaintiff could prove no set of facts that would support such a claim. For example, plaintiffs may be able to establish that Kahan acted as alleged at the owners' request in order to obtain listings. It also appears that rentals arranged by Kahan were subject to the owners' approval.

> *Ragin v. Kahan & Kahan Realty, Ltd.,* No. 79–Civ.–484 (S.D.N.Y. Aug. 7, 1979).

16. Because we decide that the landlords are liable for AM Realty's discrimination under traditional doctrines of *respondeat superior,* we do not need to consider whether they might also be liable because landlords may have a nondelegable duty not to discriminate. *See General Building,* 458 U.S. at 395–96, 102 S.Ct. at 3152–53 (defining non-delegable duty); *Walker v. Crigler,* 976 F.2d 900, 904 (4th Cir.1992) (holding that property owner's duty not to discriminate in leasing or sale of property is nondelegable).

to the law of agency. Jakabovitz contends that Judge Spatt erred by declining to give an instruction the landlords had requested as to scope of authority. Jakabovitz joined Breitman in excepting to Judge Spatt's refusal to give the following instruction which Breitman had requested:

> [I]f you find that AM Realty was the agent of Mr. Breitman, but you find that he did not authorize AM Realty to engage in any wrongful act in which AM Realty may have engaged, then you also must find for Mr. Breitman.

Judge Spatt properly declined to give this instruction because it misstated the law. Breitman and Jakabovitz did not have to authorize AM Realty specifically to discriminate in order to be liable for that discrimination. *See Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1096 (7th Cir.1992) (holding real estate brokerage firm liable for racial steering of its agents even though firm had explicitly instructed agents not to discriminate), *cert. denied,* —— U.S. ——, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); *Northside Realty,* 605 F.2d at 1354 (holding that president and vice-president of brokerage could be held liable for discriminatory acts of their agents, "whether or not [they] directed or authorized the particular discriminatory acts that occurred"). "A principal is often subject to liability for the unauthorized conduct of an agent with respect to matters which, under the agreement creating the relation, he has a right to direct." Restatement (Second) of Agency § 216 cmt. a (1958). Here, it was beyond dispute that the landlords had a right to control the criteria used by the brokers in selecting which prospective tenants would be shown Jakabovitz's and Breitman's apartments. One commentator has explained that the law imposes liability in such cases because "[i]t would be too easy for the broker or owner to plead ignorance when an agent was caught and it would be unfair to only punish a manager or agent for what the owner or employer should have controlled and trained the employee to avoid." James A. Kushner, Fair Housing

§ 4.22 at 255 (1983). The agency instructions were not erroneous.

### III. Breitman's Individual Challenges to Vicarious Liability

In addition to the challenges of both landlords to vicarious liability, Breitman also seeks to vacate the judgment against him, but on grounds pertinent only to his vicarious liability. First, Breitman challenges the basic case against him, arguing that the plaintiffs failed to make out a *prima facie* case of discrimination. He also suggests that the jury actually exonerated him by refusing to award any damages against him, and alternatively, that the jury verdict was ambiguous as to his liability.

#### A. *Prima facie* case

Plaintiffs presented the following evidence in support of their *prima facie* case of discrimination by Breitman. Ronald Luckett, an African–American tester, testified that on March 6, 1987, he went to the offices of AM Realty at 10 a.m. and spoke with salesperson Carl Matos. Luckett requested a one-bedroom apartment in Midwood or Sheepshead Bay, but said that he might settle for a studio. Matos told Luckett that he had arrived too late, and that new apartment listings came in on Monday morning or Friday afternoon. However, Matos mentioned that he had a few apartments available in another area—on Argyle Road in Flatbush. Plaintiffs' expert Professor Emanuel Tobier testified later that these apartments were in a predominantly African–American and Latino neighborhood. After seeing the apartments on Argyle Road, Luckett called Matos and was again told that there were no apartments available in the areas he had requested.

Susan Hamovitch, a White tester, testified that she arrived at AM Realty's offices at noon on the same day. She met with James Siegel, another salesperson at AM Realty.[17] She informed him that she was looking for a one-bedroom or "junior four" apartment in Midwood or Sheepshead Bay. Siegel instead suggested she view an apartment in Kensing-

---

17. It is undisputed that both Matos and Siegel had access to the same apartment listings, contained in a central listing book. According to

Fischler, this book was stolen from AM Realty's offices about two weeks after the filing of the complaint in this case.

ton, a neighborhood which she considered comparable to Midwood. Siegel then drove with Hamovitch in her car to look at the Kensington apartment, which was owned by Breitman. After she looked at this apartment, she looked at a "junior four" apartment that Siegel said was available in Sheepshead Bay. Siegel did not accompany her to see this second apartment. Siegel called her the following day to inquire about her opinion of the two apartments. He called again later in the week to report that the apartment in Kensington had been rented, and to ask whether she might be interested in viewing other apartments.

■ Breitman argues that these facts did not suffice to establish a *prima facie* case of discrimination because the African–American tester "did not apply to rent Breitman's property, nor was he rejected as a tenant." Brief of Appellant Breitman at 40. Breitman maintains that he cannot be faulted for the realty agent's failure to offer Breitman's apartment in Kensington because the tester never asked for an apartment in Kensington. Since the tester never asked, Breitman continues, there was nothing wrong with not showing him the apartment.

The problem with this argument is that it ignores the fact that the realtor offered to show Breitman's one-bedroom apartment in Kensington to the *White tester* even though she also had never asked for an apartment in that area. Enforcement of the Fair Housing Act is not to be frustrated because cunning landlords can take advantage of a large array of devices to hide their discrimination. "Rental housing discrimination is pervasive in large part because it is so easily disguised by rules and subtle practices or tactics of landlords and building managers." James A. Kushner, Fair Housing § 3.16 at 97 (1983). One of these devices is to offer to show apartments in predominantly White neighborhoods to prospective renters who are White, even if these renters do not express any interest in those neighborhoods. By so doing, the landlord can increase the chances of renting those apartments to White tenants. Breitman's crabbed reading of the statute would effectively immunize this mechanism for racial steering from judicial scrutiny.

■ Breitman's analysis does not comport with the Fair Housing Act's "broad legislative plan to eliminate all traces of discrimination within the housing field," *Marr v. Rife,* 503 F.2d 735, 740 (6th Cir.1974). As long as a plaintiff can prove that a defendant afforded an African–American person fewer housing opportunities than a similarly-situated White person on account of race, the plaintiff has made out a case under Title VIII. *See Matchmaker Real Estate,* 982 F.2d at 1096 (holding realtor liable in part because its agents "denied the black testers information about housing that they readily gave to similarly situated white testers"); T. Alexander Aleinikoff, Note, "Racial Steering: The Real Estate Broker and Title VIII," 85 Yale L.J. 808, 820 (1976) (Title VIII should prevent "the broker, at his own option, from selecting housing on the basis of race to show the customer.").

Breitman worries that if we uphold the District Court's decision against him, we will impose on landlords and realtors the nearly impossible duty of informing every prospective tenant about all available apartments, even ones in neighborhoods about which the tenant did not inquire. This fear is unwarranted. Landlords and their agents will not have to tell tenants about all apartments everywhere. They will only have to make sure that they do not provide less information to one person than to another simply on account of race.

B. Other challenges to the verdict

■ Breitman also makes the somewhat remarkable claim that he should not now be before this Court because the jury actually absolved him from any liability for discrimination. Breitman finds vindication in the fact that the jury refused to award even nominal damages against him. He points out that even though the jury assessed compensatory and punitive damages against AM Realty brokers and against Jakabovitz, it declined to assess any damages against Breitman. Judge Spatt, observing that the jury verdict held Breitman liable for AM Realty's acts of discrimination but failed to award

even nominal damages against him, asked the jury to reconsider its decision not to award even nominal damages against Breitman. When the jury reaffirmed its earlier decision, the plaintiffs moved to modify the verdict to award nominal damages against Breitman, and the Court granted that motion. *See Cabrera*, 814 F.Supp. at 277.

We believe that the jury's refusal to award damages against Breitman showed only that it believed that he was less culpable than the other defendants. The jury did, however, believe he was guilty of discrimination, as is evident from its affirmative responses to the following three questions:

1. Did the plaintiffs establish that the defendants JAMES SIEGEL and CARLOS MATOS acted within the scope of their authority and in furtherance of the business of the defendant EMANUEL FISCHLER, doing business as AM REALTY CO.?

YES XXX NO ___

3. Did the plaintiffs establish that the defendant EMANUEL FISCHLER, doing business as AM REALTY CO.[,] acted as an "agent" for the defendant BENJAMIN BREITMAN, as the Court has explained that concept to you, with regard to the incident of March 6, 1987 involving the testers RONALD LUCKETT and SUSAN HAMOVITCH?

YES XXX NO ___

5. Do you find that the plaintiff OPEN HOUSING CENTER, INC. established, that on March 6, 1987, RONALD LUCKETT was discriminated against by the defendant CARLOS MATOS because of his race, in violation of Title VIII, the Fair Housing Act?

YES XXX NO ___

These answers clearly show that (1) AM Realty acted as Breitman's agent with regard to the test conducted by Ronald Luckett and Susan Hamovitch; (2) Matos acted within the scope of his authority at AM Realty; and (3) Matos discriminated against Luckett on March 6, 1987, in violation of the Fair Housing Act. By these findings, the jury held Breitman responsible for the discrimination Luckett suffered when he sought housing at AM Realty. Moreover, it is not unheard of

for juries to find a violation of a right yet decline to award any damages. *See Fassett v. Haeckel*, 936 F.2d 118, 121 (2d Cir.1991); *Ruggiero v. Krzeminski*, 928 F.2d 558, 563–64 (2d Cir.1991). We have said that in such a case, instead of throwing out the verdict of liability against the defendant, the trial court can direct the jury to enter an award of nominal damages. *See Ruggiero*, 928 F.2d at 564; *Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir.1984).

 Breitman also contends that this verdict was ambiguous because the jury might have been thinking not about his apartment in Kensington that White tester Susan Hamovitch saw on March 6, 1987, but rather the other apartment (not owned by Breitman) that she saw on that day. Even putting aside the dubious factual basis of this objection, we hold that it was waived because Breitman failed to take up the District Court's offer to modify the verdict sheet on this score before it went to the jury. *See Cabrera*, 814 F.Supp. at 279. We see no plain error resulting in a miscarriage of justice that would allow us to ignore Breitman's waiver of the issue.

Finally, Breitman contends that there were nondiscriminatory reasons for the brokers' failure to show his apartment to the African–American tester even though they showed it to the White tester. Breitman presented these reasons at trial but the jury rejected them. We see no clear error in that decision.

## IV. Attorney's Fees

The District Court awarded plaintiffs attorney's fees and costs against defendants in the amount of $335,280.20. In awarding attorney's fees and costs, the Court relied on two statutes, 42 U.S.C. § 1988(b) and 42 U.S.C. § 3613(c)(2), the former ("The Civil Rights Attorney's Fees Act of 1976") providing for attorney's fees in sections 1981 and 1982 civil rights cases, and the latter (part of Title VIII) providing for attorney's fees in Fair Housing Act cases. As for the defendants (including Jakabovitz) who were found liable under sections 1981 and 1982, as well as Title VIII, the Court granted attorney's

fees under 42 U.S.C. § 1988(b). However, as for Breitman, who was charged and found liable only for violating Title VIII, the Court granted attorney's fees under 42 U.S.C. § 3613.

A. Retroactive application of attorney's fee amendment

 Until early 1989, a court could award attorney's fees and costs to a prevailing plaintiff in a Fair Housing Act action only if the plaintiff was "not financially able to assume said attorney's fees." 42 U.S.C. § 3612(c) (1982). In 1988, Congress eliminated the financial need requirement and opted instead to leave the granting of attorney's fees and costs to the discretion of the trial court. 42 U.S.C. § 3613(c)(2) (1988). This amendment became effective on March 18, 1989, about a year-and-a-half after the instant case had begun. Breitman contends that the Court improperly applied this amendment retroactively to this case by not requiring the plaintiffs to establish financial need before awarding them attorney's fees and costs.[18]

The District Court carefully considered Breitman's argument but rejected it on the ground that retroactive application was justified. After the District Court decision in the instant case, however, we ruled in *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 910–11 (2d Cir.1993), that the attorney's fees amendment in 42 U.S.C. § 3613(c)(2) should not be applied retroactively.[19] We held that the amendment applied only to legal services rendered on or after the amendment's effective date. Thus, in the instant case, the District Court could have awarded attorney's fees and costs for legal services rendered prior to the effective date only upon a show-

ing of financial need, but could have awarded fees and costs for services rendered on or after the effective date without such a showing. Indeed, plaintiffs admit as much in a letter to the Court. *See* Plaintiffs' Letter of October 8, 1993.

 Not ready to concede that a remand is required in light of *Ragin*, however, plaintiffs argue that they have already met the requirements of the earlier version of the statute. They contend that no remand is necessary because the District Court has already found that they are unable to pay attorney's fees. They point to the following language in the District Court opinion as demonstrating that finding:

[A hearing on the plaintiffs' financial status] would require the parties to incur additional expenses and may be an unnecessary expenditure of judicial resources for the following reasons: (1) a substantial part of the plaintiffs' attorney's fees would not be affected by the hearing's outcome, as they were incurred after the effective date of the amendments; (2) as the Open Housing Center is a not-for-profit organization, there is a reasonable likelihood that it is financially unable to meet the legal costs it incurred in this case; and (3) the defendants have stated that in order to prepare for such a hearing, they will require further discovery.

*Cabrera*, 814 F.Supp. at 286–87. However, the Court's educated guess that it is reasonably likely that a plaintiff can meet 42 U.S.C. § 3612(c)'s old requirement of financial need does not substitute for a finding on that issue. Indeed, the Court's remarks suggest the opposite of what the plaintiffs believe they say. Instead of showing that the Court

---

18. Jakabovitz does not join in Breitman's contention because the Court assessed attorney's fees against him on the basis of his sections 1981 and 1982 violations, rather than his Title VIII violations. Plaintiffs prevailing under both 42 U.S.C. § 1982 and the Fair Housing Act are "entitled to benefit from the more liberal provisions of 42 U.S.C. § 1988, which allow recovery of attorneys' fees without consideration of plaintiffs' financial circumstances, as is required by 42 U.S.C. § 3612(c)." *Woods–Drake v. Lundy*, 667 F.2d 1198, 1204 (5th Cir.1982) (citations omitted). *See also Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir.1983); *Price v. Pelka*, 690 F.2d 98,

100 (6th Cir.1982). Breitman, however, was not charged with violating sections 1981 and 1982, and the Court accordingly had to rely on the Fair Housing Act's attorney's fee provision in granting its award.

19. We have reviewed our *Ragin* holding in light of the Supreme Court's recent decisions in *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and *Rivers v. Roadway Express*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), and we find no reason to think that the result in *Ragin* was incorrect.

found the plaintiffs to be financially unable to pay attorney's fees, the quoted remarks show only that the Court decided not to undertake the burden of examining the plaintiffs' financial means because it was under the mistaken impression that such an inquiry was unnecessary.

We accordingly vacate the grant of attorney's fees against Breitman and remand for further proceedings not inconsistent with this opinion. Our order affects only that twenty percent of the total attorney's fees and costs award that is taxed to Breitman. *See Cabrera,* 814 F.Supp. at 292.

**B. The basis for awarding attorney's fees against Breitman**

Breitman also makes a more fundamental attack against the award of attorney's fees against him. He argues that the legal and equitable relief directed against him was too insignificant to justify the Court's award of attorney's fees against him. Citing *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), Breitman contends that the one dollar nominal fee award, coupled with equitable relief that was "minimal compared to that awarded against Jakabovitz . . . [or to that] requested by Appellees," was insufficient to support the award against him.

We disagree. In *Farrar,* the Supreme Court said that " 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award." *Farrar,* —— U.S. at ——, 113 S.Ct. at 574 (quoting *Texas State Teachers Association v. Garland Independent School District,* 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989)). Assuming for the argument that *Farrar's* standard, though articulated in a 42 U.S.C. § 1988 attorney's fees case, applies in a Title VIII attorney's fees case, we hold that plaintiffs easily met

that standard. The fact that plaintiffs obtained only one dollar in damages from Breitman does not automatically exempt him from paying any share of plaintiffs' attorney's fees. *See id.* at ——, 113 S.Ct. at 578 (O'Connor, J., concurring) ("[A]n award of nominal damages can represent a victory in the sense of vindicating rights even though no actual damages are proved."). Here, the plaintiffs prevailed on a significant legal issue—namely, that landlords can be held liable for employing real estate brokers who are engaged in racial steering. One does not search "in vain for the public purpose" this litigation has served. *Id.* That purpose is readily apparent: Breitman's loss in this case serves as a clear warning to landlords that the law will not tolerate their use of brokers who discriminate invidiously.

**V. Cross-appeal**

Plaintiffs cross-appeal from the District Court's reductions in their attorney's fees request. After considering the prevailing marketplace rates for the type of work performed and the experience of the attorneys, Judge Spatt decided to award partners in the case no more than $200 per hour, and associates no more than $135 per hour. *See Cabrera,* 814 F.Supp. at 288. We believe that Judge Spatt's choice of rates was well within his discretion.

Plaintiffs also cross-appeal from the Court's denial of the costs the Open Housing Center will incur in monitoring the landlords' compliance with the equitable relief ordered by the Court. Plaintiffs point out that the equitable relief ordered by the Court requires their active participation in integrating Jakabovitz's apartment buildings.[20] While we agree with the plaintiffs

---

20. A brief description of the relief ordered may be useful to show the Open Housing Center's role in that relief. In order to counter the effects of past discrimination, the District Court ordered Jakabovitz to take affirmative steps for a period of two years to attract minority tenants to his buildings. *See Cabrera,* 814 F.Supp. at 284. The District Court ordered that during these two years, Jakabovitz would have to inform the Open Housing Center of every fourth apartment that became vacant in one of seven buildings he owns in Brooklyn. The Center would then have a week, during which time it could refer "qualified

minority apartment seekers" to Jakabovitz to fill the vacancy. *Id.* During that week, Jakabovitz for his part would be able to show the vacant apartment only to those persons referred by the Center. Furthermore, Jakabovitz also would not be allowed to advertise that apartment as being available. If Jakabovitz decided to reject a prospective tenant referred by the Center, he would have to inform the Center and the applicant why he did so. If after this week, the apartment had not been rented to an applicant referred by the Center, Jakabovitz would then be free to rent it

that the Court had the discretion to award such costs, *see Matchmaker Real Estate,* 982 F.2d at 1099, we do not believe that it exceeded that discretion by denying those costs here.

## Conclusion

We affirm all aspects of the judgment except the determination of the amount of attorney's fees awarded against Breitman, and remand for further consideration of that one issue.

---

to someone not referred by the Open Housing Center (as long as he did so according to the requirements of the Fair Housing Act).

