Vincent A. MOODIE, Plaintiff,

v.

FEDERAL RESERVE BANK OF
NEW YORK, Defendant.

No. 91 Civ. 6629 (MEL).

United States District Court,
S.D. New York.

Aug. 26, 1994.

Cleary, Gottlieb, Steen & Hamilton (Raymond J. Lohier, Alex E. Miller, Anne H. Erskine, of counsel), New York City, for plaintiff.

Thomas C. Baxter, Federal Reserve Bank of New York (Jonathan I. Polk, of counsel), New York City, for defendant.

LASKER, District Judge.

An argument with a co-worker and seconds of shirt grabbing on the job led to Vincent Moodie's termination at the Federal Reserve Bank of New York ("Bank"). Moodie now sues his former employer, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that the Bank's decision to fire him was motivated, at least in part, by his race. The case was tried to the bench with able presentations by both parties.

## I.

Moodie, a 57–year–old black male of Jamaican descent, had been working as a senior computer operator at the Bank's Computer Contingency Center ("CCC") in Pearl River, New York. On October 4, 1989, he became involved in an altercation with a white co-worker, Tony Riolo. After the incident, the Bank conducted an internal investigation and, on October 13, 1989, dismissed him.

The events leading up to Moodie's dismissal are not in dispute. On Saturday, September 30, 1989, Moodie worked alone at the CCC on the night shift. His responsibilities included labeling some 600 computer tapes. At the end of the shift, Moodie left 65 tapes unlabeled, to be taken care of by the next shift. On Sunday, October 1, 1989, Tony Riolo, also a senior computer operator, wrote in the shift's turnover report: "On my arrival this morning, there were approximately 65 tapes that somebody was to [sic] lazy to label" (Ex. 11).

The following Tuesday, Moodie saw the comment in the turnover report. When he arrived at work on the evening of Wednesday, October 4, 1989, Moodie encountered Riolo—who was finishing up on the second shift—in the computer room and confronted him about the "lazy" remark. After exchanging words, Moodie and Riolo became physically engaged and were separated by other second shift employees present in the computer room. Of the three employees who witnessed the altercation, none saw what happened in its entirety. These three employees reported the incident to the second shift supervisor, Carlton Burgess, who is black. Burgess then contacted his superior, assistant chief of the CCC Andrew Howard, who is also black. Howard advised Burgess to let the CCC chief Joseph Furey, who is white, handle the matter the next day (Tr. 375).

The next morning, October 5, Furey, upon arrival at work, was told by the first shift

supervisor, Guy Gordon, that there had been an altercation between Moodie and Riolo the night before and that "apparently Vinnie had choked Tony" (Tr. 616). Furey was also advised that Moodie had come in to see him even though he was not scheduled to work that morning, and that Riolo had left a message for Furey to call him at home. Furey telephoned his superior at the home office in New York City, Kenneth Leffler, and told him that there had been an incident involving Moodie and Riolo. Leffler instructed Furey to talk to both Moodie and Riolo, and stated that he would contact personnel for guidance on how to proceed. Furey then summoned Moodie, who complained to Furey about the remark in the turnover report. When Furey asked Moodie about Gordon's report of an altercation, Moodie told Furey that "he and Tony were fooling around and he definitely did not choke Tony" (Tr. 617). After meeting with Furey, Moodie went home. Furey then telephoned Riolo, who accused Moodie of choking him.

Leffler, who had spoken to the Bank's personnel department in the interim, telephoned Furey and directed him to speak to any witnesses and to document his findings.

Later in the day, when the second shift employees who had witnessed the altercation—Jesus Sanchez, Michael Barnett and Stevenson Cantave—began arriving for work, Furey called them to his office one by one to determine what had in fact occurred. Furey asked assistant chief Howard and second shift supervisor Burgess to be present during the individual interviews he conducted with them and Riolo. At the close of the interviews, Furey read to Howard and Burgess his notes of what Riolo and each witness had stated. Furey, Howard and Burgess all testified that Furey's notes accurately reflected what each employee had said at his interview (Furey, Tr. 636; Howard, Tr. 843; Burgess, Tr. 377).

According to Furey's notes (Ex. G), the three witnesses described the events as follows:

"Jesus Sanchez—stated that Vinny and Tony were talking about the turnover and that Tony was obscured from his vision by Vinny due to his size but that it appeared that Vinny was choking Tony. He heard Tony say, 'You hurt me—I can't breath'. Jesus said that he yelled for Vinny to stop and said: 'Vinny, do you realize what you're doing—you can lose your job.' Jesus said that Vinny let go then and that he saw bruises on Tony's neck.

Mike Barnett—stated that he was on the telephone with the Head Office and didn't really hear or see all of what happened. He heard them saying something about the turnover and backups. He said he heard Tony say 'I can't breath' and heard Jesus say 'Vinny enough, enough.' He also said that he could not see where Vinny's hands were but that he jumped up from his seat and tried to pull Vinny away from Tony but couldn't.

Stevenson Contave [sic]—said that Vinny and Tony were talking about the turnover and that Tony was sitting and Vinny standing in front of him. Steve said that he saw Vinny grab Tony by the neck but at first thought that they were only kidding. He said that he heard Tony tell Vinny that Guy told him to put something in the turnover report about the tape labels and that Vinny said 'Well I'll go for Guy next.' 'I'm going to choke you.' Steve said that he heard Tony say 'I can't breath' and that he tried to pull Vinny off but couldn't."

At trial, Sanchez—the only one of the three called by the parties—further testified that he heard Moodie say to Riolo, "You wrote that remarks [sic] in the turnover. I am going to kick your ass" (Tr. 299); that he did not see where Moodie's hands were but that he "separated the two men" as "they were connected" (Tr. 301).

After these interviews, Furey summoned Moodie back to his office and confronted him with the witnesses' statements. According to Furey's notes, Moodie admitted he had grabbed Riolo but let go as soon as he saw that Riolo was getting upset (Ex. G). At this point, Furey telephoned Leffler and read his notes to Leffler before faxing a written copy in memorandum form. The Furey memorandum did not contain any conclusions or recommendations but simply recorded the statements of Moodie, Riolo and the witnesses.

Based on this information, Leffler reported to the personnel department and was told to send Moodie home pending further investigation by a personnel officer. Leffler directed Furey to tell Moodie that he should not come to work until further notice, and Furey did so.

On the following day, October 6, Leffler sent his own memorandum to the Bank's personnel office, in which he concluded:

On Wednesday, October 4, 1989 at approximately 10 p.m. Mr. Moodie physically attacked Mr. Anthony Riolo, a second shift computer operator at the CCC. An investigation of the incident ... indicates that Mr. Moodie was totally at fault, and that Mr. Riolo could have been seriously injured if not for the intervention of other CCC employees.

Based upon the seriousness of the incident, and the chance that Mr. Moodie could attack another CCC employee it is recommended that he be dismissed from the Bank.

(Ex. H).

Leffler's recommendation to dismiss Moodie was reviewed by personnel counselor Joan Smiley, who is black. Smiley's investigation consisted primarily of speaking to both Riolo and Moodie by telephone and documenting those conversations. Smiley's record of her conversation with Moodie states: "They were having a discussion and Mr. Moodie bent down and put his finger in Mr. Riolo's face. Mr. Riolo knocked his hand away and grabbed Mr. Moodie's shirt. Mr. Moodie reacted in kind. They were clowning around" (Ex. K). Smiley also reported that Moodie "admitted to grabbing Mr. Riolo's shirt" but "denied choking Mr. Riolo and could not explain why three witnesses said that he did." (*Id.*) In Smiley's memorandum concurring in Leffler's recommendation to dismiss Moodie, she stated: "Mr. Moodie is being recommended for release because he physically attacked a co-worker.... The attack was witnessed by several other co-workers who intervened to prevent serious injury" (Ex. I).

While the events described above are not in dispute, what actually occurred between Moodie and Riolo is hotly contested. Moodie testified that he waved his finger in front of Riolo's face while berating Riolo about the "lazy" remark, at which time, "Mr. Riolo called me a black, lazy bastard and slapped my hand, grazing me [sic] cheek with his right hand ... he then grabbed at my shirt and I grabbed at his shirt" (Tr. 108). Moodie emphatically denied choking Riolo and insisted that he merely grabbed Riolo's shirt around the chest area. Moodie testified that Riolo began yelling "You're choking me" in a loud voice, drawing the attention of the other computer operators, and continued to yell even after Moodie had let go of his shirt (Tr. 110). Moodie's testimony suggests that the physical engagement lasted no more than a few seconds.

Riolo, not surprisingly, expressed a different view of what happened. He denied calling Moodie a "black lazy bastard" (Tr. 285) and stated that Moodie "grabbed me and he had his hand inside my shirt and it was pressing down on my neck" (Tr. 247). Riolo further testified that Moodie's "other hand he had drawn back like he was ready to hit me" (Tr. 250). He claimed to have suffered a "sore neck" (Tr. 257). Riolo testified at trial that Moodie held him for "maybe a minute or so" but admitted that, at Moodie's unemployment compensation hearing before an administrative law judge, he had stated that the contact lasted "approximately five minutes" (Tr. 253–54).

On October 13, 1989, a week after Leffler submitted his recommendation to dismiss Moodie and after the Bank's personnel department, its medical officer and equal employment opportunity (EEO) officer approved of the recommendation, Moodie was dismissed by the Bank. Shortly after he lost his job, an avalanche of misfortune fell on Moodie. His house and his cars were repossessed because he could not make the payments (Tr. 135), he became homeless and "slept in abandoned cars, underneath bridges" (Tr. 136), he subsisted for a time on money from sympathetic colleagues at the CCC (Tr. 407). Around September 1991, after the Equal Employment Opportunity Commission issued a determination that his complaint did not establish a Title VII violation (Ex. R), Moodie began hearing voices,

had suicidal thoughts and was eventually committed to a mental hospital for a month (Tr. 141–42). Moodie now resides in Detroit, living on his social security disability check and a $130 a month pension from the Federal Reserve Bank (Tr. 144).

## II.

To prevail on a claim of race discrimination, a plaintiff must establish by a preponderance of the evidence that the conduct of the defendant in terminating him was motivated, at least in part, by his race; in other words, that race was a "determinative factor" in the employer's decision to dismiss him. *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983). The factfinder "is entitled to infer, but need not infer, that this burden has been met" if the plaintiff has established a prima facie case and if the factfinder "disbelieve[s] the defendant's explanation." *Cabrera v. Jakabovitz*, 24 F.3d 372, 382 (2d Cir.1994), citing *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination"). However, the defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1091, 67 L.Ed.2d 207 (1981). The employer's burden is satisfied "if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Id.* at 256, 101 S.Ct. at 1095 (citation omitted).

Moodie contends that the Bank's decision to dismiss him was racially motivated and that its stated reason for doing so—that he started the physical altercation with Riolo—was a pretext or coverup for discrimination. He argues that Furey's investigation and Leffler's recommendation to dismiss him were tainted by racial prejudice. The Bank denies this charge, contending that its officers, in good faith, believed and continue to believe that Moodie was the aggressor and that the Bank terminated him in accordance with its uniformly-applied personnel practice of discharging the aggressor in incidents of workplace violence.

The determination of this case depends on whether (1) the Bank's internal investigation was conducted in discriminatory fashion; (2) the Bank uniformly discharged the aggressor in cases of violence between the employees and, if so; (3) the policy was discriminatorily applied in Moodie's case. Although what actually occurred between Moodie and Riolo is relevant, it is not decisive. Nor does the disposition of this case rest on the factfinder's view of whether the Bank's decision to terminate Moodie was wise or fair. The sole question is whether the Bank's conduct as to Moodie was lawful or whether it violated Title VII.

## III.

As proof that his discharge, and in particular Furey's investigation, was tainted by racial prejudice, Moodie points to several facts that he claims support an inference of discrimination: (1) unlike Riolo, he was not given the opportunity to tell his side of the story in the presence of the black supervisors Howard and Burgess; (2) Furey did not ask Howard and Burgess for their opinions or conclusions; (3) he was sent home, whereas Riolo was permitted to remain at work; (4) in evaluating the evidence, Furey failed to consider Moodie's reputation among co-workers as a peaceful person and Riolo's reputation as an aggressive and argumentative person; (5) Furey failed to check whether the incident had been captured on the CCC's video security cameras.

However, I find that Furey's testimony and that of other witnesses provide credible non-discriminatory explanations to each of the propositions raised by Moodie.

(1) The evidence shows that when Moodie first came to talk to Furey on the morning of October 5, Furey had little idea of what had happened the night before and had no reason to ask any of his supervisors to be present. Furey testified that he only began conducting more formal interviews after he heard a conflicting story from Riolo and found out that three computer operators had witnessed the altercation (Tr. 638). After all three neutral witnesses indicated that there had

been an altercation and that, as Furey put it, "supposedly Vinnie attempted to choke Tony," Furey gave Moodie another opportunity that afternoon to tell his side of the story (Tr. 639). Moodie again told Furey that they were only fooling around. (*Id.*)

While it would have been prudent for Furey to have arranged for Howard and Burgess to be present at the second meeting with Moodie, nothing suggests that his failure to do so was racially motivated. Moreover, even though Howard and Burgess were present to hear Riolo's version, they were never called upon by Furey to give their opinions as to what actions should be taken or even as to what conclusions either of them drew from the statements made by Sanchez, Barnett and Cantave. The sole contribution which Burgess and Howard were called on to perform was to validate the accuracy of Furey's notes of what Sanchez, Barnett and Cantave had said took place. In any event, Burgess testified at trial that he did speak to Moodie privately and that Moodie stated "he did not choke Tony Riolo, but he went over to tickle Tony" (Tr. 391). Although Burgess did not report this to Furey, what Moodie told Burgess was not much different from what he told Furey and was clearly at odds with what the witnesses reported.

(2) Furey did not ask the black supervisors, Howard and Burgess, for their opinions, but neither did Furey himself express an opinion or conclusion in the memorandum he prepared for Leffler. Furey saw his job as the fact finder and, as Burgess testified, asked Howard and Burgess to be present during the interviews in order to verify his notes of the neutral witnesses' statements (Tr. 387). There is no evidence to suggest that Furey deliberately limited the role of Howard and Burgess for sinister or racial reasons. Although Burgess testified at trial that he thought Riolo was exaggerating his injuries—at one point wearing a neck brace to work and feigning a hoarse voice, Burgess never expressed these doubts to Furey (Tr. 388). Howard, the CCC's assistant chief, also questioned Riolo's honesty but likewise kept it to himself (Tr. 435–36). Although Howard was not asked his opinion at the

time as to who was the aggressor, at trial he testified that he believed Moodie was:

Q. Did you have any doubt as to who the aggressor was in this altercation?

A. No, I did not.

Q. Who was that?

A. Mr. Moodie.

THE COURT: What was the basis of your conclusion that Mr. Moodie was the aggressor?

A. Based on the evidence of the three individuals that was called in.

(Tr. 449).

(3) The evidence shows that Furey sent Moodie home pursuant to a directive from the Bank's personnel office. There is no evidence to suggest that Furey sent Moodie home in an effort to railroad him, or that Moodie's race was a factor underlying Leffler's or the personnel office's instruction for Furey to do so.

(4) The testimony of Bank employees and of Riolo himself established that Riolo has a reputation for being an argumentative person and has had run-ins with other co-workers prior to the incident with Moodie. The evidence also shows that Riolo embellished his story of the altercation with Moodie in different ways and at different times, at one point claiming that he had been choked for as long as five minutes (Tr. 253). Nevertheless, I find that Moodie has not proven that Furey was unreasonable to conclude that he was the aggressor because Moodie's version of the altercation was clearly more at odds with the accounts given by the neutral witnesses than Riolo's version, however exaggerated. In the final analysis, Furey testified that he did not believe either Riolo's or Moodie's story entirely, but instead "looked more ... at just what the operators were telling me. Again, they were the only ones there" (Tr. 643). It is notable that none of the witnesses ever stated that he saw Riolo's hands on Moodie.

(5) Furey testified that he never looked at the security camera videotape for the simple reason that he "never thought of it" (Tr. 640). Furey also testified that the cameras were used by security guards to monitor who was coming in and out of the CCC but that "to my knowledge, we've never ever gone and

looked at a tape" (Tr. 692). None of the bank employees who testified, including Moodie himself, had suggested at the time that the security videotape be checked. The evidence does not suggest a racial motivation for Furey's failure to check the tape.

In sum, Moodie has not shown by a preponderance of the evidence that Furey's investigation was tainted by racial prejudice.

## IV.

Moodie also alleges that the decision of Kenneth Leffler to recommend Moodie's dismissal was motivated by race. As evidence of Leffler's racial animus, Moodie points to the following: Leffler's conclusion that he was "totally at fault" and was a danger to his fellow workers was not supported by the Furey memorandum; Riolo was never reprimanded for making the "lazy" remark in the turnover report and was not terminated even though he engaged in the same conduct as Moodie; Moodie's conduct did not rise to the level of significant physical violence that justified immediate dismissal even under the Bank's own policy. Each of the propositions is addressed in turn.

*Leffler's conclusion.* On summation, Moodie's counsel argued that only racial prejudice could have caused Leffler to conclude that Moodie was totally at fault in the incident and posed a threat to other employees (Tr. 953). Moreover, to bolster the inference that Leffler's conclusions were motivated by race, Moodie claims that an earlier decision by Leffler to demote him in 1988 was also influenced by Moodie's race.

I find that although Leffler's conclusion that Moodie was "totally at fault" did not reflect the fact that Riolo's "lazy" remark had precipitated the argument, Moodie has nevertheless failed to prove that the conclusion was unreasonable or racially motivated. Leffler's conclusion was supported by the evidence available to him. Indeed, personnel officer Smiley, who is black, similarly concluded that Riolo's remark did not justify Moodie's actions: "the references to his (lack of) performance do not appear sufficient to induce the behavior exhibited" (Ex. I). While reasonable people viewing the facts reported by Furey could disagree with Lef-

fler's conclusion that Moodie posed a continued threat to his co-workers, Moodie's reported statement "I'll go for Guy next" provided sufficient basis to justify Leffler's concern (Tr. 731–32).

Moodie's counsel cross examined Leffler at length regarding the decision Leffler made in 1988 to demote Moodie in an attempt to show that the earlier demotion had been race based, and suggested that Leffler was predisposed to believe Riolo because he is white. However, Leffler explained credibly, and his explanation was corroborated by other Bank employees and memoranda, that the demotion was prompted by complaints from staff members working under Moodie's supervision, including the allegation that he had lied to them on more than one occasion (Tr. 761–62). Although Moodie's counsel established that, at the time, Leffler had the option of giving Moodie a final warning rather than demoting him, I find that Moodie failed to prove by a preponderance of the evidence that the demotion was racially motivated. Indeed, the Bank's EEO officer Donald R. Moore testified that Moodie had filed a complaint with his office alleging race discrimination at the time of his demotion, but later told Moore that "there really was no charge of discrimination, that he was not serious about that. He simply sent it to see how far it would go" (Tr. 802). Moodie did not seriously challenge Moore's trial testimony. When asked if he had made such a statement to Moore, Moodie answered, "I don't recall" (Tr. 169). Nor does the demotion support an inference that Leffler's recommendation to dismiss Moodie was influenced by considerations of race. The facts relating to the demotion support the inference that Leffler did not believe Moodie's version of the altercation because of the past complaints regarding Moodie's truthfulness just as much as they support Moodie's claim of discrimination.

*Relative treatment of Riolo and Moodie.* As further evidence of discrimination, Moodie posits that Riolo, who is white, engaged in the same conduct as Moodie—shirt grabbing—but was not similarly punished. While Moodie and Riolo were treated differently by the Bank, I find that the evidence supports

the proposition that the disparity of punishment resulted from what the Bank believed in good faith to be a difference in conduct rather than from racial discrimination. Although Moodie steadfastly disputes it, the weight of the evidence supports the Bank's conclusion that Moodie was the aggressor in the fight.

However, why Riolo was never reprimanded for making the "lazy" comment in the turnover report remains unexplained. Such a remark is admittedly against the CCC's unwritten policy that personal comments are not to be made in work reports (Tr. 433). Nevertheless, although this fact is troubling, it alone is insufficient to support a finding of discrimination. *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994) ("*some* evidence is not sufficient ... a plaintiff ... must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's [race] was the real reason for the discharge") (emphasis in original).

Moreover, the Bank's record as an employer, while of course not decisive as to whether it discriminated against Moodie, is relevant. The evidence shows that minorities are employed by the Bank at all levels and departments, and that the Bank has promoted black employees to significant positions. Burgess testified that he was hired by the Bank in 1970 as a security guard and rose through the ranks to his present position of computer operations supervisor (Tr. 324–25). Adlai Ray Bolden, another black employee and former colleague of Moodie, testified that since he started at the Bank in 1978 as a messenger, he has been promoted several times and now works as a data processing supervisor (Tr. 562–63). Carl W. Turnipseed, also black, testified that he joined the Bank in 1969 and currently serves as senior vice-president and manager of the Bank's

Buffalo branch (Tr. 475–78). Of course, the evidence of the Bank's otherwise good personnel record would not excuse a violation. However, because Moodie's evidence in support of the inference that race made a difference rests in part on an attack of the Bank as an institution where, as Moodie's counsel argued on summation, "[b]lack employees were less likely to be believed than white employees because of their color" (Tr. 953), the institutional record is relevant and tends to undermine Moodie's claim.

*Nature of Moodie's conduct.* Moodie argues that his conduct was not sufficiently serious to warrant dismissal even under the Bank's stated policy on workplace violence and that, therefore, race was the real reason for his dismissal.

In response, Turnipseed, a Bank vice-president, who at one time served as head of personnel, testified to five other instances of workplace violence at the Bank in which the employee determined after an internal investigation to be the "aggressor" was discharged and the "victim" (non-aggressor) retained (Tr. 495–500). In one case, a white aggressor was discharged and the black victim retained; in another a black aggressor was discharged and the white victim retained; a third involved a black aggressor who was discharged and a black victim retained. In the final two cases both parties were discharged after a determination that both were at fault. The accuracy of this testimony was not challenged, and neither on cross examination or otherwise did Moodie establish that his conduct was materially different from that of the "aggressors" in these cases.

\* \* \*

In light of these findings, I conclude that Moodie has not established by a preponderance of the evidence that the Bank's decision to discharge him was based, in whole or in part, on his race.[1]

1. A further issue—that Moodie committed "resume fraud"—is now moot because Moodie has not prevailed on his claim of race discrimination. However, to complete the record in the event of an appeal, I make the following findings of fact: Moodie made an admittedly false statement concerning the reason for his leaving a prior employer on his application to the Bank (Ex. A).

Moodie claims that Tony Hedman of the employment agency MPI Systems advised him to make the false statement. Hedman emphatically denied it at trial (Tr. 821, 828) and his testimony is fully accepted. The Bank presented uncontested evidence that Bank employees who make false statements on employment applications are discharged without exception. Accordingly, the

To find that the plaintiff has not proven his case is not to fail to sympathize with the plaintiff as to the impact which the Bank's decision has had on his life. I note that Howard and Burgess both testified—albeit with understandable trepidation—that based on their respective views of the facts they would not have fired Moodie and that they thought Moodie had been treated unfairly (Burgess, Tr. 354; Howard, Tr. 444). While one may agree with their sentiment, Title VII affords no remedy for unfortunate management decisions.

Moodie is not alone in recent years in losing his job with heavy consequential damages as a result. Yet one would hope that somehow the rigid application of institutional policies could be tempered to avoid such drastic consequences. But these are questions of social policy not committed to the Court.

This memorandum of decision contains the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

Moodie's complaint against the Federal Reserve Bank of New York is dismissed. It is so ordered.

Bank has established by a preponderance of the evidence that Moodie's false statement is cause for discharge and that Moodie would have been dismissed on January 5, 1993, the date on which the parties agree the Bank discovered the false statement.